BREWER, ATTORNEYS & COUNSELORS
William A. Brewer III (*pro hac vice*)
wab@brewerattorneys.com
Shain A. Khoshbin  (*pro hac vice*)
sak@brewerattorneys.com
Jack G. B. Ternan (*pro hac vice*)
jgt@brewerattorneys.com
5900 Comerica Bank Tower
1717 Main Street
Dallas, Texas 75201
Telephone:  (214) 653-4000
Facsimile:  (214) 653-1015

THE COLTON LAW FIRM
Michael A. Colton (SBN 083231)
825 Jennings Avenue
Santa Barbara, California 93103
Telephone:  (805) 455-4546
Facsimile:  (805) 965-9623
coltonlaw@gmail.com

*Attorneys for Plaintiffs DCD Partners, LLC; Personal Involvement Center, LLC; and Reverend Dr. J. Benjamin Hardwick, as trustee of the Personal Involvement Center Trust No. 1*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DCD PARTNERS, LLC, a California limited liability company; PERSONAL INVOLVEMENT CENTER, LLC, a Nevada limited liability company; and REVEREND DR. J. BENJAMIN HARDWICK, as trustee of the PERSONAL INVOLVEMENT CENTER TRUST NO. 1,**<br><br>Plaintiffs,<br><br>v.<br><br>**TRANSAMERICA LIFE INSURANCE COMPANY, a corporation, TRANSAMERICA LIFE INSURANCE COMPANY, successor in interest to TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY; and DOES 1-30,**<br><br>Defendants. | Case No. 2:15-CV-03238-CAS-VBK<br><br>**SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT; BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; TORTIOUS BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING; UNFAIR COMPETITION; DECLARATORY JUDGMENT; NEGLIGENT MISREPRESENTATION; AND REQUEST FOR CONSTRUCTIVE TRUST AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR TRIAL BY JURY** |

Plaintiffs DCD Partners, LLC ("DCD"); Personal Involvement Center, LLC ("PIC LLC"); and Reverend Dr. J. Benjamin Hardwick, as trustee of the Personal Involvement Center Trust No. 1 (the "Trust") (collectively, DCD, PIC LLC, and the Trust are referred to herein as "Plaintiffs"), by and through their undersigned counsel, file this Second Amended Complaint against defendants Transamerica Life Insurance Company ("Transamerica"), which is also successor in interest to Transamerica Occidental Life Insurance Company, and Does 1-30 (collectively, "Defendants"), and, based upon personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters, allege as follows:

## I. JURISDICTION & VENUE

1.     This action was removed to this Court by Defendant Transamerica's Notice of Removal pursuant to 28 U.S.C. § 1441(a) from the Superior Court of the State of California for the County of Los Angeles.

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332.

3.     Venue is proper in this Central District of California pursuant to 28 U.S.C. § 1391.

## II. PRELIMINARY STATEMENT

4.     Historically,   inner-city   African-Americans   have   experienced difficulties in obtaining life insurance.   Therefore, Reverend Dr. J. Benjamin Hardwick, Pastor of the Praises of Zion Baptist Church, worked with Transamerica to develop a race-neutral life insurance program that would provide benefits to the members of his congregation to, for example, pay burial expenses.   Pursuant to the program, an investor, in exchange for a portion of the benefits, would pay the premiums on the policies issued on members of the congregation who chose to take part in the program.   The remainder of the benefits would be provided to the named insured's designated beneficiary and non-profit entities that provide services to youth and families while improving the quality of life in the South Los

Angeles community.  In March 2004, Transamerica issued 1,229 policies ("Pool 1") under the program.  Then in November 2004, Transamerica issued an additional 1,171 policies ("Pool 2") (Pool 1 and Pool 2, together, are referenced herein as the "Policies").

5.    For nearly a decade, Transamerica collected millions of dollars in premiums on these charitable life insurance policies, and the Policies provided benefits to the insureds, their families, and various non-profit entities.  Specifically, the payment of the life insurance benefits enabled the families of the insureds to pay for funeral and other expenses upon the death of their loved ones. Unfortunately, Transamerica has recently ***more than doubled*** the amounts charged for these policies.  Transamerica decided to change the economics of the insurance it provided to further its own financial interests in violation of its contractual, statutory, and common law obligations.  The effect of these changes is to make the premiums cost prohibitive and to deprive the beneficiaries of the very benefits they were to receive.  Transamerica has singled out this African-American community for improper price increases.  It did so despite promises not to do so contractually and during the marketing of the policies.

6.    Having enriched itself in the form of premiums and community goodwill, Transamerica is now breaching the commitments made to Reverend Hardwick to administer the program so as to allow his parishioners to gain insurance benefits which they otherwise would not have received.  Regrettably, Transamerica has dishonored its commitments and duties of good faith and put the Policies and benefits at risk.  In particular, Transamerica recently more than doubled the charges and premiums billed for the Policies.  Through those increases, Transamerica seeks gains to which it is not entitled while depriving the beneficiaries of the Policies of the very benefits they were to receive.  Plaintiffs, the owners of the Policies, file this lawsuit to bring a halt to Transamerica's

breaches of its legal obligations and to recover for the millions of dollars in damages already incurred.

### III.  THE PARTIES

**A.    Plaintiffs**

7.    Plaintiff DCD Partners, LLC ("DCD") is a limited liability company, duly organized and existing under the laws of the State of California.  Its principal place of business is located at 1999 Avenue of the Stars, Suite 2850, Los Angeles, California 90067.  DCD is an owner of the Policies.

8.    Plaintiff Personal Involvement Center, LLC ("PIC LLC") is a limited liability company, duly organized and existing under the laws of the State of Nevada.  PIC LLC is an owner of Pool 2.

9.    Plaintiff Reverend Dr. J. Benjamin Hardwick ("Reverend Hardwick") is a citizen of California and the trustee of Personal Involvement Center Trust No. 1.  Reverend Hardwick is the Pastor of the Praises of Zion Baptist Church, located in Los Angeles, California, and founded the Personal Involvement Center. Personal Involvement Center Trust No. 1 is an owner of Pool 1.   Reverend Hardwick is also a manager of the Personal Involvement Center, LLC.   Reverend Hardwick has also served as the President of the Western Baptist State Convention of California.

**B.    Defendants**

10.    Defendant Transamerica Life Insurance Company, which is also the successor in interest to Transamerica Occidental Life Insurance Company, is a corporation duly organized and existing under the laws of the State of Iowa, with its principal place of business located at 4333 Edgewood Road NE, Cedar Rapids, Iowa 52499.   Transamerica is registered to conduct business in the State of California and has appeared in this case through counsel.   Transamerica's corporate predecessor issued the Policies, and Transamerica administered the Policies during the relevant timeframe herein.

11.    The true names and capacities, whether individual, corporate (including officers and directors thereof), associate or otherwise, of Defendants sued herein as DOES 1 - 30, inclusive, are unknown to Plaintiffs.   Plaintiffs therefore sue these Defendants by such fictitious names.   Plaintiffs will amend the Complaint to allege their true names and capacities when they have been ascertained.   In the meantime, Plaintiffs are informed and believe, and based on such information and belief allege, that each of Defendants designated as a DOE has been involved in or is in some manner responsible as a principal, beneficiary, agent, servant, employee, co-conspirator, joint venturer, alter ego, or otherwise, for the occurrences alleged herein, has been acting in the authorized scope of his/her/its agency or employment, or is otherwise subject to or liable for the relief prayed for below.

12.    Plaintiffs are further informed and believe, and based on such information and belief allege, that all acts of each of Defendants were authorized or ratified by each of the remaining Defendants.   In addition, Plaintiffs are further informed and believe, and based on such information and belief allege, that at all relevant times herein, each of Defendants, including each of those Defendants sued in the name of DOE, was a co-conspirator, aider, abettor, alter ego, servant, affiliate, successor, or predecessor of some or all of co-Defendants and that, in connection with the acts, omissions, practices, and breaches set forth above and below, was acting within the scope of such relationship or with the permission or consent of the co-Defendants.

## IV.  FACTS COMMON TO ALL CAUSES OF ACTION

### A.    The Development Of Transamerica's Charitable Insurance Program

13.    In the 1990s, Transamerica worked with North America National Marketing LLC to develop the TransValue universal life insurance policies. TransValue policies were initially intended to be sold in the executive carve-out

market; however, in the early 2000s, Transamerica began actively considering the use of the TransValue product for a Charitable Insurance Program ("CIP").

14.    When evaluating the appropriateness of the TransValue product for the CIP, Transamerica was aware that several industry mortality tables showed higher mortality rates than assumed in the TransValue pricing.   Accordingly, Transamerica conducted internal reviews of the pricing assumptions of the TransValue product.

15.    As a result, Transamerica concluded that inadequate disclosures regarding the CIP program were being made to potential purchasers of TransValue policies.   In particular, the marketing materials provided to various non-profit entities showed rates of return to the charities that, internally, Transamerica considered unlikely.   Transamerica knew that disclosure to potential purchasers of its internal projections of the charity's expected rate of return would result in potential purchasers declining to participate in the CIP.

16.    Although Transamerica concluded that its profitability targets would be achieved using the TransValue pricing assumptions, contingency plans were internally discussed by Joel Seigle, then a Senior Vice President of Transamerica; Ron Wagley, then President of Transamerica; and Chris Garrett, chief financial actuary for Aegon, N.V., the owner of Transamerica.   In these discussions, Mr. Garrett made clear that Transamerica would increase the amounts charged to policy holders in the event the performance of the policies substantially departed from profitability targets.   Indeed, by the summer of 2003, Mr. Seigle knew from these secret discussions that increases in the monthly deductions charged by Transamerica would be the corporate policy in response to such events.

**B.    Transamerica Issues The Policies Purportedly To Benefit An Underserved Community But With Secret Contingency Plans.**

17.    Reverend Hardwick is the Pastor of the Praises of Zion Baptist Church, a predominately African-American church located in Los Angeles,

California.   Reverend Hardwick has spent the majority of his life serving the community.   He is also the founder of the Personal Involvement Center, a non-profit organization located in Los Angeles, California, which provides vital services to children and families in Los Angeles and the surrounding area.

18.   In the late 1990s, with the help of The Cochran Firm, Reverend Hardwick was introduced to Transamerica's Chartable Life Insurance division and learned about a life insurance vehicle known as charitable-owned life insurance ("CHOLI") policies.   CHOLI policies are structured to allow a charitable organization to purchase life insurance policies on consenting donors' lives, while an investor pays the premiums.   Reverend Hardwick's goal was to develop a structure that would allow members of the church who participated in the program to ensure that their loved ones would not be burdened with burial expenses.   The program was also structured to grant the owners a benefit from each Policy.

19.   From the outset, Reverend Hardwick wished to ensure that Transamerica (or any other life insurance provider) would not charge rates for the policies higher than the rates charged to others in the general population.   Reverend Hardwick explained to representatives of Transamerica that his congregation was predominately low-income African-Americans.   In a letter attached hereto as Exhibit A from Joel Seigle, Transamerica explicitly stated that it would not discriminate against African-Americans by charging higher rates for these Policies.   In particular, Transamerica stated:

> In addition, please understand that for us to charge different rates based on anything other than the normally accepted insurance categories of gender, smoker status, and age, would be an unacceptable business practice under the corporate principles by which we operate as well as standard insurance regulations.

20.   Transamerica's promise not to discriminate against the African-American community was material to Reverend Hardwick in the decision to

proceed with Transamerica's life insurance program.    Reverend Hardwick reasonably relied on Transamerica to comply with its promises and industry regulations.

21.    In fact, Reverend Hardwick sought and received specific assurances from Mr. Seigle and others representing Transamerica that Transamerica would administer the Policies as initially structured.    Reverend Hardwick reasonably relied on Transamerica and its assurance that the company would achieve its profitability targets for the Policies without any significant changes to its structure.

22.    In truth, it was unreasonable for Transamerica to believe the truth of its representations.    Mr. Seigle was aware that, contrary to his representation to Reverend Hardwick, Transamerica's overriding corporate policy was to achieve its internal profitability targets by raising rates above those set during the issuance of the Policies.    Moreover, at the time Transamerica made the above representations, it understood that it would be insuring a high risk population under the Policies. While each applicant filled out an application, which identified certain risk information such as smoking status and age, no health examinations were required by Transamerica.

23.    Nonetheless, Transamerica proclaimed itself publicly "ready and willing" to assist Reverend Hardwick in making this program successful.    In addition to whatever financial opportunity Transamerica saw in issuing the Policies, it also claimed that it recognized the program as a way to provide much-needed services to an underserved portion of the community.

24.    In reliance on Transamerica's promises, commitments, and representations, Reverend Hardwick and other local pastors began to identify applicants for the insurance policies offered by Transamerica.    They recruited hundreds of congregants to participate.    On March 9, 2004, Transamerica approved and issued 1,229 TransValue policies ("Pool 1") to the Trust.    On November 9, 2004, Transamerica approved and issued 1,171 TransValue policies to PIC LLC

("Pool 2") (Pool 1 and Pool 2 are collectively referred to as the "Policies").  At the time of issuance, at least 99% of the individual insureds were African-Americans.

25.   Each Policy provides a death benefit totaling $275,000.  Specifically, upon the death of an insured, Transamerica makes three payments: (1) $15,000 to the insured's beneficiary for funeral and other expenses; (2) $35,000 to PIC LLC (which is distributed between various non-profit entities and projects); and (3) $225,000 to the investor paying the premiums.

**C.   The Terms And Structure Of The Policies**

26.   Each individual Policy is a written contract between Plaintiffs and Transamerica.  Pursuant to each Policy, Transamerica agreed to pay death benefits — provided that the Policy was in force (*i.e.,* had not lapsed) at the time of the death of the Policy's named insured.

27.   A policy will lapse if the policy's "Accumulation Value" is less than the "Monthly Deduction."  The Accumulation Value increases with each premium payment by Plaintiffs and decreases with each Monthly Deduction by Transamerica.  Pursuant to the Policy terms, the Accumulation Value accrues interest, which Transamerica adds to the Accumulation Value on a monthly basis.

28.   The Accumulation Value reflects an economic benefit to the owner of the Policy.  In particular, the Accumulation Value is used to calculate the cash value of the Policy, which the policy owner can use for purposes of borrowing funds or for obtaining cash from Transamerica in exchange for surrendering the Policy.  The aggregate cash value of the Policies at the time of the increase in rates was approximately $260,000.

29.   Accordingly, an increase by Transamerica of the Monthly Deductions affects Plaintiffs in at least two ways.  First, an increase in the Monthly Deductions reduces the economic value of a Policy to each Plaintiff by reducing the Accumulation Value received from each premium payment.  This reduction in Accumulation Value reduces the Cash Value, which reduces the amount of cash

that can be obtained in the form of a loan or through the surrender of the Policy. Second, an increase of the Monthly Deductions increases the amount of premium payments that must be made in order to prevent a Policy from lapsing. Because an administrative charge of 10.4% is subtracted by Transamerica from each premium payment, each $1 increase in the Monthly Deduction requires an increased premium payment of $1.11 to prevent the policy from lapsing.

30. For the Policies, the Monthly Deduction is the sum of three amounts. The first amount is the product of the monthly deduction rate ("MDR"), multiplied by 0.001, multiplied by the difference between the death benefit and the accumulation value of the policy computed at the beginning of the policy month. The second amount consists of the policy fee, which is fixed at $4.33 per month. The third amount is the product of the monthly expense charge per thousand ("MEC"), multiplied by 0.001, multiplied by the face amount of the policy.

31. When each Policy was issued, Transamerica set an initial MDR for each policy year ("Issuance Monthly Deduction Rates"). For a specific Policy, the Issuance Monthly Deduction Rate was the same for policy years one through five. Typically, the Issuance Monthly Deduction Rate would not be the same for the sixth and each subsequent policy year. For instance, the Issuance Monthly Deduction Rate for policy year ten (i.e., the amount Transamerica intended to charge on year ten when the Policy was issued) might be 0.4 per thousand while the Issuance Monthly Deduction Rate for policy year eleven might be 0.43 per thousand.

32. While the Policies provide that Transamerica "will determine the monthly deduction rate for each policy month at the beginning of that policy month," Transamerica was applying the Issuance Monthly Deduction Rates until April 2013. In other words, from the beginning of a policy year until the year's conclusion, Transamerica had been charging the Issuance Monthly Deduction Rate for that respective policy year. Accordingly, while the MDR for each Policy

would typically increase each year, the amount charged was predictable and known to Plaintiffs because Transamerica was not charging an MDR different than the Issuance Monthly Deduction Rate.

33.     The Policies provide "the monthly deduction rate for the base policy will depend on:  the Insured's gender; the Insured's smoking status; the Insured's class of risk as of the Policy Date; the number of years that the policy has been in force; and the Insured's attained age."   The Policies provide that Transamerica "will never use higher rates."   The Policies also provide that "[a]ny change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors.   Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes."   In addition, the Policies provide that Transamerica does "not distribute past surplus or recover past losses by changing the monthly deduction rates."   These provisions regarding the monthly deduction rates are referred to herein as the "MDR Provisions."

34.     The Policies do not provide for changes to the monthly expense charge.  However, the Policies do provide that Transamerica "will never use higher expense charges."   These provisions are referred to herein as the "MEC Provisions."

35.     The language of the Policies places limitations on Transamerica's ability to change the MDR.  For instance, each Policy provides that:

> [Transamerica] will determine the monthly deduction rate for each policy month at the beginning of that policy month.   The monthly deduction rate for the base policy will depend on:   the Insured's gender; the Insured's smoking status; the Insured's class of risk as of the Policy Date; the number of years that the policy has been in force; and the Insured's attained age.

36.    The "class of risk as of the Policy Date" for each of the Policies was either "Standard Smoker" or "Standard Non-smoker."  These two risk classes are common risk classes used by Transamerica and other insurers issuing life insurance policies.  Other risk classes used by Transamerica include "Preferred Smoker," "Preferred Non-Smoker," and "Preferred Plus."  A risk class consists of individuals with similar mortality risks (such as blood pressure, family mortality history, and other attributes).  The "Standard" risk classes have the highest mortality rates of the risk classes insured by Transamerica.

37.    While the same risk classes are used across product lines, Transamerica may assess different charges to members of a risk class based on a product's specific features.  For instance, the manner in which Transamerica charges holders of term and whole life policies differs from the manner in which it charges holders of universal life insurance policies.  Similarly, holders of universal life insurance products might be charged differently because certain cost factors, such as the commission or cash surrender value formulas, might differ between product lines.

38.    Although the specific calculation used and amount charged by Transamerica to members of the same risk class might differ across product lines, Transamerica is legally precluded from changing the amount charged on some but not all members of the same risk class.  For instance, if the morality rates for the entire Standard Non-smoker risk class increased, Transamerica would be permitted to recalculate the amounts charged for all policies of all product types that use the Standard Non-smoker risk class.  However, if the morality rates for the entire Standard Non-smoker risk class increased, Transamerica could not recalculate the amounts charged for only a sub-set of the Standard Non-smoker risk class.  Similarly, if the morality rate of some individuals within the Standard Non-smoker class exceeds the morality rate of the class as a whole, Transamerica cannot create

a subclass that receives new, higher charges while leaving the original rates for the rest of the risk class unaltered.

39.     The prohibition on changing the amounts charged to a sub-set of the risk class is found in the Policy language and California law.  The Policies provide that "the monthly deduction rate for the base policy will depend on" the listed five factors.  The policy form and product type are <u>not</u> among the contractually listed factors upon which the MDR will depend.  Therefore, a change in MDR based on whether an individual was insured using policy form NMUL-PC or the TransValue product line would be a breach of the Policy language.  Similarly, the Policies provide that the MDR will depend on "the Insured's class of risk as of the Policy Date".  Accordingly, Transamerica cannot change the MDR for a sub-set of the class of risk as of the Policy date.  Additionally, California Insurance Code Section 790.03(f) prohibits "[m]aking or permitting any unfair discrimination between individuals of the same class and equal expectation of life in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contract."

40.     On a monthly basis, Transamerica typically delivers to DCD a "Notice of Payment Due," which provides a "premium amount" and "total payment due" for each individual policy.  The Notice of Payment Due provides a "Projected Remittance Amount" that constitutes a sum of the "total payment due" for each individual policy.  At all relevant times, DCD has paid all amounts billed by Transamerica, and Plaintiffs have complied with the terms of the Policies.

41.     Transamerica recognizes a duty to disclose information to Plaintiffs.  For instance, the Policies provide that Transamerica "will send [Plaintiffs] a statement at least once a year showing:  the face amount; accumulation value; cash value; loans; partial surrenders; surrender penalty free withdrawals; Additional Credits; premiums paid; and charges as of the statement date.  Upon written request at any time, [Transamerica] will send an illustration of [Plaintiffs'] policy

benefits and values."  Transamerica has not sent Plaintiffs such a statement for each Policy at least once every year.  In prior Statements of Policy Value, Transamerica stated: "we would be pleased to supply you with a fully detailed accounting of every transaction occurring in your account since your last statement date."  Moreover, in an "Important Policyowner Notice" Transamerica stated: "You should consider requesting more detailed information about your policy to understand how it may perform in the future."

**D.    DCD Agrees To Pay The Policy Premiums And Becomes An Owner Of The Policies.**

42.    In 2009, DCD acquired an interest in the Policies through assignments from the Trust and PIC LLC.  Transamerica provided information in connection with the ownership restructuring.  In particular, Transamerica represented in writing to a principal of DCD that Transamerica had only increased the cost of insurance once in the last thirty years.  DCD reasonably relied upon that representation and the representations which had been made previously to Reverend Hardwick and others and expected that the Issuance Monthly Deduction Rates and MEC would not be increased by Transamerica.  Raising the MDR and MEC would allow Transamerica to reap gains to which it is not entitled and deprive the beneficiaries of the very benefits the program was designed to achieve.

43.    At various times, including on or about October 23, 2009 and February 7, 2011, Transamerica provided Plaintiffs with a TransValue® For Groups Guide to the Composite Illustration ("Illustrations").  Transamerica is obligated to provide such Illustrations pursuant to the Policies.  The Illustrations contain total policy premium projections for each future policy year.  These premium projections reflected a calculation by Transamerica using the Issuance Monthly Deduction Rates.  The Illustrations constitute representations of existing fact regarding the continued vitality of the Issuance Monthly Deduction Rates.

44.     The Illustrations did not show that Transamerica intended to depart from the Issuance Monthly Deduction Rates and more than double the Monthly Deductions and, thus, were deceptive.   Indeed, Plaintiffs did not receive an Illustration showing a projection based on the increased Monthly Deductions until Plaintiffs specifically requested information regarding the sharp increase in premiums sought by Transamerica.

45.     Transamerica intended for Plaintiffs to rely on the Illustrations to induce them to continue their participation in the CIP, and Plaintiffs did rely on the Illustrations to their detriment.   Plaintiffs' reliance was reasonable because Transamerica had represented to Plaintiffs that it had only changed its rates once in the last thirty years, and Plaintiffs had no method to ascertain that Transamerica was secretly considering a change in the rates to be charged on these Policies.

46.     Further, it was unreasonable for Transamerica to represent that it had the present intent to continue to use the Issuance Monthly Deduction Rates. Unbeknownst to Plaintiffs, Transamerica's policy was to raise the MDR above the Issuance Monthly Deduction Rates in the event that profitability targets were not met, and the Policies had not been achieving Transamerica's profitability targets. Indeed, Transamerica's corporate parent had been pressuring Transamerica to take action on these Policies and had encouraged the departure of executives involved in the issuance of the Policies.

47.     Today, the Trust, PIC LLC, and DCD are the owners of the Policies. Since the inception of the Policies, Transamerica has not notified Plaintiffs of any increases in the MDR or MEC components of the Monthly Deductions.

**E.     Transamerica Reneges On Its Commitment To Plaintiffs And The Community, And Drastically Increases The Cost Of The Policies.**

48.     In a recent Notice of Payment Due, the Projected Remittance Amount—*i.e.*, the amount of premium payments requested by Transamerica—had increased by approximately 50 percent.   That Notice of Payment Due did not

describe in any detail how the monthly premium amounts were calculated, explain the substantial increases in the Projected Remittance Amount, or advise that the MDR or MEC had been increased.  On February 18, 2014, Transamerica delivered a Notice of Payment Due for Pool 1 that increased the Projected Remittance Amount by an additional 62.5 percent.  In the fall of 2014, Transamerica delivered a Notice of Payment Due for Pool 2 that increased the Projected Remittance Amount by an additional 64.8 percent.

49.     While Transamerica has, thus far, succeeded in concealing the full nature of its wrongdoing, the consequences of its misconduct are stark.   Prior to the increases in the Projected Remittance Amounts, Plaintiffs paid approximately $1,831,589 ($152,632 per month) in annual premiums for the Policies.   As of January 2015, projected annual premium payments were $4,318,873 ($359,906 per month), representing a 135.8 percent increase in annual premiums.   Unless stopped by the Court, Transamerica's price hike is projected to, over the life of the policies, result in approximately $100 million in increased premium payments that would not have been necessary if Transamerica had continued to charge the Issuance Monthly Deduction Rates.

50.     Because of Transamerica's failure to provide material information concerning the Policies, Plaintiffs have been unable to confirm the specifics of Transamerica's wrongful conduct.  Indeed, Transamerica did not provide Plaintiffs with any notice of such an increase in the monthly deduction rate or monthly expense charges for the Policies.

51.     Nonetheless, it is clear that Transamerica has increased the Monthly Deductions in violation of the Policy terms and its marketing of the policies. Specifically, although not discovered by Plaintiffs until later, Transamerica ceased using the Issuance Monthly Deduction Rates for the MDR in April 2013.  Instead, for most Policies, Transamerica began using, for each policy year, an MDR that is

higher than the Issuance Monthly Deduction Rate for that year ("Higher Monthly Deduction Rates").

52.     Transamerica's decision to charge the Higher Monthly Deduction Rates rather than the Issuance Monthly Deduction Rates constitutes a breach of numerous provisions of the Policies.  Transamerica's decision to cease charging the Issuance Monthly Deduction Rates and instead begin charging the Higher Monthly Deduction Rates was not the result of a reassessment or recalculation of the costs of insuring the Standard Non-smoker and Standard Smoker risk classes. If Transamerica had doubled the rates charged to the Standard Smoker or Standard Non-smoker risk classes for all or even a significant portion of the life insurance policies issued by Transamerica, thousands (if not millions) of policy owners other than Plaintiffs would have seen a doubling of their premiums.  A widespread doubling of premiums would have produced a public outcry.  The absence of media reports indicating a widespread increase in premiums demonstrates that Transamerica's doubling of rates was limited to the Policies owned by Plaintiffs.

53.     Indeed, when DCD contacted Transamerica regarding the premium increases, Transamerica was willing to admit that the Policies constituted "nearly all" of the "class" that is experiencing the rapid increase in Monthly Deductions. Moreover, Transamerica refused to disclose to DCD if any policyholder other than Plaintiffs received a similar increase in Monthly Deductions.  Transamerica's statements to DCD confirm that the Monthly Deduction that Transamerica has used for each Policy does not depend solely on the age, sex, smoking status, risk class, and policy duration as required by the Policy language.  Instead, Transamerica has impermissibly used some other criteria—mostly likely race—to set the Monthly Deduction for each Policy, causing Plaintiffs to incur costs that exceed those charged to similarly situated insureds.

54.     The Policies provide that Transamerica "will never use higher rates." Transamerica has breached those provisions by ceasing to charge the Issuance Monthly Deduction Rates and charging the Higher Monthly Deduction Rates.

55.     Transamerica contends that the phrase "never use higher rates" should be interpreted to mean "never use higher than the maximum rates."   Even if Transamerica's improper construction of the Policies were accepted, Transamerica has nonetheless breached that provision.   For instance, based on the maximum rates contained in the policy terms for Policy No. 46-6149, the Monthly Deduction could not exceed $50.89 during policy year 2012-2013.     However, after Transamerica increased the rates during that policy year, Transamerica was charging a monthly deduction of $569.08 for Policy 46-6149.   Transamerica has failed to disclose information to Plaintiffs sufficient to identify other instances in which Transamerica has charged rates in excess of the maximum limits established in the Policies.

56.     Each Policy also provides, "Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors."   The costs of insuring Standard Smokers and Standard Non-smokers have not materially changed, much less doubled, since the issuance of the Policies. Accordingly, Transamerica's doubling of the MDR cannot be based on a change in "cost factors."   Instead, Transamerica has doubled the MDR to increase the profitability of the Policies to Transamerica, in breach of its promise to set the MDR based on "cost factors."   Indeed, since at least 2003, it has been the secret policy of Transamerica to increase rates if profitability targets are not met.

57.     For almost a decade, Transamerica has collected premiums on the Policies.   Plaintiffs are informed and believe, and on the basis of such information and belief allege, that Transamerica wants to increase its profitability, shed the Policies on disadvantaged African-American citizens in Los Angeles, and bring about the lapse of the Policies by making the premiums cost-prohibitive.

Transamerica's conduct has already resulted in millions of dollars in damages. Without the intervention of the Court, the families of the named insureds will be deprived of funds which would cover funeral and other expenses, and the community will be deprived of the charitable works funded by the Policies, such as hot meals and education programs.  In order to obtain a remedy for Transamerica's wrongful acts and omissions, Plaintiffs have been forced to bring this action.

## V.  <u>CAUSES OF ACTION</u>

**A.      FIRST CLAIM FOR RELIEF:**

**<u>(Breach Of Written Contract Against Transamerica)</u>**

58.      Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs 1 through 57, inclusive, as though fully set forth hereat.

59.      The Policies are valid, enforceable contracts between Plaintiffs and Transamerica.

60.      All amounts billed by Transamerica for the Policies have been paid, and Plaintiffs have performed all of their obligations under the Policies.   All conditions precedent have been performed, waived, or excused.

61.      The Policies provide that Transamerica "will determine the monthly deduction rate for each policy month at the beginning of that policy month.  The monthly deduction rate for the base policy will depend on:  the Insured's gender; the Insured's smoking status; the Insured's class of risk as of the Policy Date; the number of years that the policy has been in force; and the Insured's attained age." Transamerica has breached that provision by: (1) changing the amounts charged to Plaintiffs without adjusting the amounts charged to others with the same risk classifications, and (2) charging the Higher Monthly Deduction Rates to Plaintiffs rather than the Issuance Monthly Deduction Rates because the race of the individuals insured is African-American.

62.      The Policies further provide that Transamerica "will never use higher rates."  Transamerica has breached that provision by ceasing to charge the

Issuance Monthly Deduction Rates and instead charging the Higher Monthly Deduction Rates.

63.     The Policies also provide that "[a]ny change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors.  Such cost factors may include, but are not limited to:  mortality; expenses; interest; persistency; and any applicable federal, state and local taxes."  In addition, the Policies provide that Transamerica does "not distribute past surplus or recover past losses by changing the monthly deduction rates."  Transamerica has breached these provisions by: (1) increasing the monthly deduction rates to increase profitability rather than to address increases in cost, and (2) charging the Higher Monthly Deduction Rates to Plaintiffs rather than the Issuance Monthly Deduction Rates because the race of the individuals insured is African-American.  Alternatively, Transamerica has increased the monthly deduction rates in order to recover for past losses.

64.     The Policies do not provide for changes to the monthly expense charge.  However, the Policies do provide that Transamerica "will never use higher expense charges."   Transamerica breached these provisions by increasing the monthly expense charges.

65.     The Policies provide for numerous disclosure obligations to Plaintiffs. Transamerica has breached those provisions by, among other things, failing to provide Plaintiffs with information regarding the increases in the Monthly Deductions.

66.     In short, Transamerica has breached its contractual duties and obligations owed to the Plaintiffs under the Policies, including the MDR Provisions and MEC Provisions, by increasing the monthly deduction rates in violation of the MDR Provisions, by increasing the monthly expense charges in violation of the MEC Provisions, and by, among other things, demanding increased premiums in order to pay for the improperly-increased Monthly Deductions.

67.   Transamerica's breaches of the Policies have proximately caused damages in an amount to be determined at the time of trial.

68.   With respect to future Monthly Deductions under the Policies, Plaintiffs seek an injunction precluding Transamerica from continuing to utilize the current monthly deduction rates and monthly expense charges which constitute a breach of the Policies, requiring Transamerica to utilize only monthly deduction rates and monthly expense charges permitted under the Policies and applicable law, and to otherwise comply strictly with the terms of the Policies.

**B.    SECOND CLAIM FOR RELIEF:**

**(Breach Of The Covenant Of Good Faith And Fair Dealing Against Transamerica)**

69.   Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs 1 through 57, inclusive and paragraphs 59 through 68, inclusive, as though fully set forth hereat.

70.   The Policies are valid, enforceable contracts between Plaintiffs and Transamerica.

71.   Implied in the Policies are covenants of good faith and fair dealing by Transamerica.  Transamerica owed Plaintiffs a duty to act in a manner that did not frustrate and disappoint the reasonable expectations of Plaintiffs under the Policies.

72.   For example, the purpose of the Policies is and has always been to provide funds to families in their time of need and to the Plaintiffs and to provide an Accumulation Value to the owners of the Policies.  Without DCD's continuing payments of the premiums under the Policies, no one would receive benefits under the Policies.  To the extent that Transamerica has any discretion under the Policies in determining the monthly deduction rates and the monthly expense charges, Transamerica cannot exercise that discretion in a manner that would frustrate and deprive Plaintiffs of the benefits of the Policies.

73.     Assuming *arguendo* that Transamerica did not violate an explicit contractual provision of the Policies by increasing the monthly deduction rates and monthly expense charges, Transamerica breached the covenant of good faith and fair dealing because Transamerica's exercise of discretion to increase the Monthly Deductions, and to thereby force an increase in premium payments, wrongfully deprives Plaintiffs of the benefit of the Policies.   Indeed, any increase in the Monthly Deductions reduces the Accumulation Value, which provides a basis for obtaining cash in the form of loans or policy surrenders.   Moreover, if left unabated, Transamerica's increase of the Monthly Deductions will frustrate and deprive Plaintiffs and the other beneficiaries of the reasonably expected benefits of the Policies.

74.     Transamerica's breaches of the covenant of good faith and fair dealing have proximately caused damages in an amount to be determined at the time of trial.

75.     With respect to future Monthly Deductions under the Policies, Plaintiffs seek an injunction precluding Transamerica from continuing to utilize the current monthly deduction rates and monthly expense charges which constitute breaches of the covenant of good faith and fair dealing, and requiring Transamerica to utilize only monthly deduction rates and monthly expense charges that would not frustrate or deprive Plaintiffs of the reasonably expected benefits of the Policies.

## C.     THIRD CLAIM FOR RELIEF:

### (Tortious Breach Of Duty Of Good Faith And Fair Dealing Against Transamerica)

76.     Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs 1 through 57, inclusive, paragraphs 59 through 68, inclusive, and paragraphs 70 through 75, inclusive, as though fully set forth hereat.

77.   The Policies are valid insurance contracts between Plaintiffs and Transamerica.

78.   As an insurer, Transamerica has a special relationship with Plaintiffs and owes Plaintiffs heightened duties of good faith and fair dealing.  Life insurance policies, like those owned by Plaintiffs, protect families and charities from the economic harm and risk presented by death.  As is the case with most insurance contracts, the financial interests of Transamerica and Plaintiffs are directly at odds, in that Transamerica benefits from increasing the charges to Plaintiffs and Plaintiffs are harmed by such increases.  Indeed, Transamerica benefits if Plaintiffs are forced to forfeit the Policies because of its increases of the Monthly Deductions because it will have obtained premium payments without having to pay the death benefits.   Transamerica and other life insurers have an incentive to force policyowners to bring suit in order to enforce their contractual rights.

79.   For these reasons, Transamerica owes Plaintiffs heightened duties of good faith and fair dealing.  Among other things, Transamerica is required to refrain from doing anything to injure the right of Plaintiffs to receive the benefits of the Policies.  Transamerica is required to give at least as much consideration to the welfare of Plaintiffs as it gives to its own interests.  Furthermore, Transamerica has a duty to reasonably inform Plaintiffs of Plaintiffs' rights and obligations under the Policies.

80.   Transamerica has breached these duties.  Transamerica has frustrated and disappointed the reasonable expectations of Plaintiffs under the Policies.  Indeed, Transamerica has improperly increased the Monthly Deductions, correspondingly increased premium payments, and tortiously deprived Plaintiffs of the benefit of the Policies.  In increasing the Monthly Deductions, Transamerica did not give proper consideration to the welfare of Plaintiffs and served solely its own selfish interests.  In addition, Transamerica has failed to reasonably disclose or describe its course of conduct, or to reasonably disclose or explain the basis and

reasons for its course of conduct.  Transamerica's acts and omissions were and are unreasonable and without proper cause.  If left unabated, Transamerica's conduct will frustrate and deprive Plaintiffs and the other beneficiaries of the reasonably expected benefits of the Policies.

81.     Transamerica's breaches of these duties have proximately caused damages in an amount to be determined at the time of trial.

82.     Transamerica's conduct was intentional and deliberate and constitutes oppression, fraud, or malice.  Plaintiffs are entitled to recover punitive and exemplary damages in an amount to be determined by the trier of fact.  Plaintiffs also seek an order requiring Transamerica to disgorge all money, funds, benefits, distributions, or other amounts or gains that they received in connection with the above-referenced wrongful acts and omissions, including the imposition of a constructive trust over the proceeds of such actions.

83.     With respect to future Monthly Deductions under the Policies, Plaintiffs seek an injunction precluding Transamerica from continuing to utilize the current monthly deduction rates and monthly expense charges which constitute breaches of its duties of good faith and fair dealing, and requiring Transamerica to utilize only monthly deduction rates and monthly expense charges that would not frustrate or deprive Plaintiffs of the reasonably expected benefits of the Policies.

**D.     FOURTH CLAIM FOR RELIEF:**

**(Unfair Competition Against Transamerica And Does 1-35)**

84.     Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs 1 through 57, inclusive, paragraphs 59 through 68, inclusive, paragraphs 70 through 75, inclusive, and paragraphs 77 through 83, inclusive, as though fully set forth hereat.

85.     Transamerica committed acts of unfair competition as defined by Business and Professions Code section 17200, *et seq*., by engaging in the following practices, among others, which are unfair, fraudulent, and unlawful:

(a) Increasing the monthly deduction rates, monthly expense charges, and premiums of the Policies in a manner not permitted by the express terms of the Policies, including discriminating amongst members of the same risk classes.  The monthly deduction rates, monthly expense charges, and premiums were increased so that Transamerica could improve its profitability and financial position and to cause Plaintiffs to surrender some or all of the Policies.  Transamerica breached its duties under the Policies by improperly increasing the monthly deduction rates, monthly expense charges, and premiums in order to gain or retain an unfair competitive advantage over other life insurers;

(b) Making representations regarding Transamerica's business practices, including representations that it has only increased rates once in thirty years and that it would be an "unacceptable business practice under the corporate principles" of Transamerica to base rates on anything other than gender, smoker status, and age, that were deceptive.

(c) Continuing to provide illustrations and other information after the sale of the Policies without disclosing that there would be sudden and dramatic increases in the monthly deduction rates, monthly expense charges, and premiums; and

(d) Concealing from Plaintiffs the material increase in the monthly deduction rates or monthly expense charges, and not providing any advance notice that it intended to massively and suddenly increase the Monthly Deductions and premiums.

86.   Transamerica's unfair, fraudulent, and unlawful practices are continuing in nature.  Plaintiffs request that the Court issue an injunction against Transamerica enjoining it from further unfair, fraudulent, and unlawful conduct, and requiring Transamerica to utilize only monthly deduction rates and monthly

expense charges permitted under the Policies and applicable law and to otherwise comply strictly with the terms of the Policies and applicable law.

87.    Plaintiffs request that the Court order restitution be paid by Transamerica for premiums and other amounts wrongfully acquired, obtained, and collected as a result of the wrongful and unlawful increase in the Monthly Deductions.

88.    Plaintiffs request an award of attorneys' fees as the prevailing parties in their request for injunctive relief against Transamerica.

**E.     FIFTH CLAIM FOR RELIEF:**

**(Declaratory Relief Against Transamerica)**

89.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs 1 through 57, inclusive, paragraphs 59 through 68, inclusive, paragraphs 70 through 75, inclusive, paragraphs 77 through 83, inclusive, and paragraphs 85 through 88, inclusive, as through fully set forth hereat.

90.    An actual controversy has arisen and now exists between Plaintiffs and Transamerica concerning the respective rights and duties of the parties under the Policies and applicable law.

91.    Transamerica contends that, in the future, it may further increase the monthly deduction rates, monthly expense charges, and premiums under the Policies and the applicable law.  Plaintiffs contend that such further increases would not be proper under the Policies and the applicable law.

92.    Plaintiffs request a declaration as to their on-going rights under the Policies and request that the Court declare (a) that Transamerica cannot raise the monthly deduction rates unless it changes the rates on a uniform basis for an entire class of insureds; (b) that Transamerica cannot increase the monthly deduction rate and monthly expense charge; and (c) if the Court finds that Transamerica can increase either the monthly deduction rate or the monthly expense charge, the specific guidelines that govern the factual circumstances under which

Transamerica can increase the monthly deduction rates, so that future controversies under the Policies may be avoided.

93.    There exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.   A judicial declaration pursuant to Cal. Civ. Proc. Code § 1060 is necessary and appropriate at this time so that Plaintiffs' rights under the Policies may be determined with certainty.

**F.     SIXTH CLAIM FOR RELIEF:**

**(Negligent Misrepresentation Against Transamerica)**

94.    Plaintiffs incorporate by reference each and every allegation in the preceding paragraphs 1 through 57, inclusive, paragraphs 59 through 68, inclusive, paragraphs 70 through 75, inclusive, paragraphs 77 through 83, inclusive, paragraphs 85 through 88, inclusive, and paragraphs 90 through 93, inclusive, as through fully set forth hereat.

95.    As set forth above, Transamerica represented to Plaintiffs that certain facts were true.   For instance, Transamerica made representations to Plaintiffs regarding a purported corporate policy of non-discrimination, the profitability of the Policies as initially structured, and its intent to continue charging the Issuance Monthly Deduction Rates when issuing the Illustrations.   Those representations were not true.

96.    Transamerica did not have reasonable grounds for believing the representations were true when they made them.  For instance, Transamerica knew of its overriding corporate policy to increase rates in the event its profitability targets were not met, knew it was insuring a high risk population, and, at the time it issued the Illustrations, knew it was not reaching its profitability targets.

97.    Transamerica intended for Plaintiffs to rely on the representations when entering into and continuing its participation in the CIP, and Plaintiffs did reasonably rely on the representations when entering into and continuing its participation in the CIP.

98.   As a result of Plaintiffs' reliance on the misrepresentations, they have suffered damages in an amount to be determined at the time of trial.

## VI.  **REQUEST FOR RELIEF**

99.   Wherefore, Plaintiffs request that this Court enter judgment in their favor and against Defendants, jointly and severally, for the following relief:

(A)  A declaratory judgment of the parties' rights and obligations, as set forth above;

(B)  Actual, compensatory, consequential, and monetary damages in an amount to be determined at trial;

(C)  Exemplary, punitive, statutory, and multiple damages in an amount to be determined at trial;

(D)  An order requiring Defendants to disgorge all money, funds, benefits, distributions, or other amounts or gains that they received in connection with the above-referenced wrongful acts and omissions, including the imposition of a constructive trust over the proceeds of such actions;

(E)  With respect to future Monthly Deductions, an injunction precluding Defendants from continuing the current monthly deduction rates and monthly expense charges which constitute breaches of contractual duties, breaches of duties of good faith and fair dealing, and other unfair, fraudulent, or unlawful acts and omissions, and requiring Transamerica to utilize only monthly deduction rates and monthly expense charges permitted under the Policies and applicable law that would not frustrate or deprive Plaintiffs of the reasonably expected benefits of the Policies;

(F)  An injunction precluding Defendants from further increasing the monthly deduction rates and monthly expense charges;

(G)  Reasonable attorneys and other professional fees, expenses and costs (including, but not limited to, witness fees), and other recoverable expenses or costs, incurred by Plaintiffs as a result of these proceedings;

(H)   Pre-judgment and post-judgment interest at the highest rate(s) allowed by law;

(I)   Costs of Court; and

(J)   Such additional relief, at law and in equity, to which Plaintiffs may be justly entitled and which this Court deems just and proper.

Dated:  September 8, 2015        By:      */s/* JACK G. B. TERNAN
                                                     Jack G. B. Ternan

WILLIAM A. BREWER III
(admitted *pro hac vice*)
SHAIN A. KHOSHBIN
(admitted *pro hac vice*)
JACK G. B. TERNAN
(admitted *pro hac vice*)
BREWER, ATTORNEYS & COUNSELORS
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone:   (214) 653-4000
Facsimile:   (214) 653-1015


MICHAEL A. COLTON, Esq.
coltonlaw@gmail.com
THE COLTON LAW FIRM
825 Jennings Avenue
Santa Barbara, CA  93103
Telephone:  (805) 455-4546
Facsimile:   (805) 965-9623

Attorneys for Plaintiffs
DCD PARTNERS, LLC, PERSONAL INVOLVEMENT CENTER, LLC, and REVEREND DR. J. BENJAMIN HARDWICK, as trustee of the PERSONAL INVOLVEMENT CENTER TRUST NO. 1

---

**SECOND AMENDED COMPLAINT - 29**

## JURY DEMAND

Plaintiffs request a trial by jury.


Dated:  September 8, 2015          By:     */s/* JACK G. B. TERNAN
                                            Jack G. B. Ternan

                                   WILLIAM A. BREWER III
                                   (admitted *pro hac vice*)
                                   SHAIN A. KHOSHBIN
                                   (admitted *pro hac vice*)
                                   JACK G. B. TERNAN
                                   (admitted *pro hac vice*)
                                   BREWER, ATTORNEYS & COUNSELORS
                                   1717 Main Street, Suite 5900
                                   Dallas, Texas 75201
                                   Telephone:   (214) 653-4000
                                   Facsimile:    (214) 653-1015

                                   MICHAEL A. COLTON, Esq.
                                   coltonlaw@gmail.com
                                   THE COLTON LAW FIRM
                                   825 Jennings Avenue
                                   Santa Barbara, CA  93103
                                   Telephone:   (805) 455-4546
                                   Facsimile:    (805) 965-9623

                                   Attorneys for Plaintiffs
                                   DCD PARTNERS, LLC, PERSONAL
                                   INVOLVEMENT CENTER, LLC, and
                                   REVEREND DR. J. BENJAMIN HARDWICK, as
                                   trustee of the PERSONAL INVOLVEMENT
                                   CENTER TRUST NO. 1

# Exhibit A


**TRANSAMERICA**
INSURANCE & INVESTMENT GROUP

JOEL D. SEIGLE
Senior Vice President
Life Products Marketing

1150 South Olive Street
Los Angeles, CA 90015-2211
Voice 213 741-7772
Fax 213 741-7988
joel.seigle@transamerica.com

September 10, 2003

Dr. J. Benjamin Hardwick
President,
Praises of Zion Church
8222 S. San Pedro St.
Los Angeles, California 90003

*213-7424012*

Dear Dr. Hardwick:

I wish to respond to your question concerning the policies that have been applied for by the PIC insurance program. Please be assured that this is the same product that would be available for any similar group that might apply for coverage. The internal charges, benefits and features are exactly the same as we would issue in all states where the policies have been approved, which at this point is all states except for New York where we are not licensed to conduct business.

In addition, please understand that for us to charge different rates based on anything other than the normally accepted insurance categories of gender, smoker status, and age, would be an unacceptable business practice under the corporate principles by which we operate as well as standard insurance regulations.

Once again, I thank you for your selection of Transamerica Occidental Life as a provider of coverage for your insurance program.

Sincerely yours,

JDS:tv

cc:  Ralph D. Day, CFP
     Ed Carey

Transamerica Occidental Life Insurance Company
Transamerica Life Insurance and Annuity Company
Transamerica Financial Advisors, Inc.

# EXHIBIT "A"