**[REDACTED] CIVIL MINUTES – GENERAL**       **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | | Date | August 9, 2017 |
|---|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**       **[REDACTED]**

(IN CHAMBERS) - DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Filed January 27, 2017, dkt. 145)

## I.   INTRODUCTION

On June 19, 2015, plaintiffs DCD Partners, LLC ("DCD"), Personal Investment Center, LLC ("PIC LLC"), and Reverend Dr. J. Benjamin Hardwick ("Hardwick"), as a trustee of the Personal Involvement Center Trust No. 1 ("PIC Trust") (collectively, "plaintiffs") filed the operative Second Amended Complaint in this suit against defendant Transamerica Life Insurance Company ("Transamerica"). Dkt. 40 ("SAC"). The SAC asserts the following claims against Transamerica: (1) breach of contract, in violation of California law; (2) breach of the covenant of good faith and fair dealing; (3) tortious breach of the duty of good faith and fair dealing; (4) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; (5) declaratory judgment; and (6) negligent misrepresentation. Id.

On January 27, 2017, defendant filed the instant motion for summary judgment. Dkts. 145 (redacted); 169 (sealed) ("Motion"). On June 17, 2017, plaintiffs filed an opposition. Dkts. 210 (redacted); 219 (sealed) ("1st Opposition"). On July 3, 2017, defendant filed a reply. Dkts. 230 (redacted); 233 (sealed) ("Reply"). Defendant's reply was accompanied by numerous objections to the evidence submitted by plaintiffs in opposition and the Reply memorandum identified several issues with plaintiffs' opposition.

**[REDACTED] CIVIL MINUTES – GENERAL**   **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

On July 7, 2017, plaintiffs filed a notice of errata regarding their opposition. Dkt. 236 ("1st Errata"). The 1st Errata sought to amend 21 of the footnote citations in the 1st Opposition as well as supplement 17 of the exhibits. Id. On July 9, 2017, defendant filed an objection to plaintiffs' 1st Errata arguing that it was in the nature of a surreply and, in any event, failed to cure all of the defects identified by defendant in the Reply. Dkt. 237. On July 10, 2017, plaintiffs filed a second notice of errata regarding their opposition. Dkt. 241 ("2nd Errata"). The 2nd Errata sought to amend eight paragraphs of a declaration submitted in opposition, add three new paragraphs thereto, and further supplement twelve exhibits. Id. On July 11, 2017, the Court permitted plaintiffs to file several documents relating to both errata under seal. Dkt. 242. In light of plaintiffs' substantive alterations of their opposition, the Court ordered that plaintiff file no further errata on the matter and permitted defendant to file an additional memorandum addressing information and arguments raised in plaintiffs' amended opposition. Id. On July 18, 2017, defendant filed a supplemental brief. Dkts. 259 (redacted); 262 (sealed) ("Supp. Reply").[1]

On July 31, 2017, the Court held oral argument regarding the instant motion and ordered the parties to submit supplemental authorities. Dkt. 318. On August 1, 2017, the parties filed supplemental authorities in support of their positions. Dkts. 319, 320.

Having carefully considered the parties' arguments, the Court finds and concludes as follows.

---

[1] Plaintiffs' 1st Errata included several exhibits that had not been included with their original opposition, see e.g. dkts. 236-15, 236-16, 236-17, 236-18, 236-19, and amended others that had been previously filed, see e.g. dkt. 236-6 (unsigned deposition pages contained in exhibit 53). Plaintiffs' 2nd Errata amended one exhibit from plaintiffs' 1st Opposition, see dkt. 241-5 (exhibit 10), and further amended others, see e.g. dkt. 241-10 (signed copy of previously unsigned exhibit 53). For purposes of this order, the Court relies exclusively upon the most recently filed, superseding version of plaintiffs' exhibits insofar as they appear to have been cited in either plaintiffs' corrected opposition memorandum, dkt. 236-1 ("Opp'n Memo"), or plaintiffs' original statement of genuine disputes (which was never amended or corrected), dkt. 219-1 ("SGD").

**[REDACTED] CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

## II.    BACKGROUND

Unless otherwise noted, the following facts are undisputed.[2]

As Hardwick testified during his deposition, Hardwick is an 85-year-old pastor who has worked at a church in the Los Angeles area for 61 years. In the 1960's, one of Hardwick's congregants was killed by police while driving his wife to the hospital and his family could not afford burial expenses. As a result of the situation, Hardwick became concerned with whether his congregants and others like his congregants had life insurance. Hardwick and Johnny Cochran, a prominent African American lawyer in Los Angeles, developed an idea to try to help Hardwick's congregants and others like them obtain life insurance ("PIC Congregants"). Dkt. 241-5, Herman Decl. Ex. 10, Hardwick Deposition Transcript ("Hardwick Depo.") at 12:19-13:11. Plaintiffs have not offered evidence regarding the racial composition of all of the PIC Congregants; however, Hardwick estimates that his own congregants, which comprise a substantial portion of the

---

[2] Notwithstanding plaintiffs' two errata, plaintiffs do not appear to have filed at least some of the evidence upon which they rely. See e.g. Opp'n Memo n. 18 (directing the Court to "Ex. 3 (Tate Dep. 151:15-152:6); Ex. 2 (Seigle Dep. 82:4-20, 105:14-25)," which are deposition transcript pages that are not included among plaintiffs' exhibits). The district court is not required "to scour the record in search of a genuine issue of triable fact. [Courts] rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). To the extent that plaintiffs' corrected memorandum or SGD relies upon evidence that has not been submitted to the Court, the Court will not search the voluminous record in this case to determine if *other evidence* exists supporting a contention.

Defendant objects to consideration of numerous statements and exhibits offered by plaintiffs. The Court will resolve these objections insofar as the reasoning here turns upon consideration of any evidence subject to objection.

| | [REDACTED] CIVIL MINUTES – GENERAL 'O' | | |
|---|---|---|---|
| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

PIC Congregants, are 85 to 90 percent African-American. The remaining congregants are Hispanic.[3] Id. at 27:4-5.

Decades later, Transamerica offered to insure the PIC Congregants. However, Hardwick was aware that any policies would have to be financed by an outside investor who would pay the premiums in exchange for a substantial portion of the death benefits. Part of the goal of the policies was to alleviate the need for PIC Congregants, many of whom are low income or unemployed, to pay life insurance premiums. Eventually, after identifying the prospective Transamerica insurance policies, Hardwick and others working on his behalf identified DCD as a potential investor to pay premiums in exchange for a portion of the death benefits.[4]

After decades of effort by Hardwick, the parties here negotiated two pools of policies for PIC Congregants (collectively the "Policies"). In March 2004, Transamerica issued 1,229 policies ("Pool 1"), of which DCD and PIC Trust are co-owners. In November 2004, Transamerica issued 1,1171 additional policies ("Pool 2"), of which DCD and PIC LLC are co-owners. Each of the Policies was written on the same Transamerica life insurance policy form, the TA TransValue form NMUL-PC (the "TransValue Form"). DCD pays all of the premiums; however, in the event an insured person dies, his or her family receives a portion of the death benefit.

---

[3] The parties have not described the precise mission, activities, or membership of the PIC entities (PIC LLC and PIC Trust). However, the PIC entities appear to be charitable organizations run by Hardwick. See Dkt. 152-6 (indicating Hardwick was president and chief executive officer of the Personal Involvement Center).

[4] It is unclear from the parties' briefing exactly when DCD became connected to the insurance policies at issue in this case. Nor are the circumstances that led to DCD's investment clear. During oral argument, defense counsel indicated that there were two unspecified investors between 2004 and 2009, neither of whom is a party here. At an unspecified time in 2009, DCD invested in the Policies and began paying premiums. At an unspecified time in 2011, according to defense counsel, Michael Rosenfeld purchased DCD. Rosenfeld is the manager and owner of DCD today.

**[REDACTED] CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

The gravamen of the SAC is that, in 2014, Transamerica increased the monthly deduction rate affecting the Policies for impermissible reasons.

###   A.     The Language of the Policies

As they relate to this action, all of the Policies contain the same operative language.

Pursuant to the Policies, owners are not charged a predetermined premium. Instead, the policy owner decides how much to pay in premiums each month. Premiums are deposited into an account for each policy. Each month, Transamerica subtracts an amount from each policy account and deposits a separate amount of interest. Interest accrues on the account's balance based upon minimum rates and average annual rates guaranteed by each policy. The net amount in each policy account is known as the Accumulation Value. The Policies remain in force, and their death benefit remains payable, so long as the Accumulation Value exceeds monthly withdraws by Transamerica.

The amount of premium payments necessary to keep a policy in force depends, principally, upon the Accumulation Value and the monthly deduction. The monthly deduction is equal to (1) the Monthly Deduction Rate ("MDR") multiplied by the difference between the Accumulation Value and the death benefit then multiplied by .001, plus (2) a monthly deduction for any policy riders, plus (3) a set policy fee, plus (4) a monthly expense charge ("MEC"). The MEC on the Policies has never changed. In this action, plaintiffs challenge an increase to the MDR affecting the Policies.

The Policies provide:

A **Monthly Deduction** is an amount we withdraw from the accumulation value of the policy (or of each layer, respectively) at the beginning of each policy month.

\*\*\*

**[REDACTED] CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

> **Monthly Deduction Rates** -- We will determine the monthly deduction rate for each policy month at the beginning of that policy month. The monthly deduction rate for the base policy will depend on: the Insured's gender; the Insured's smoking status; the Insured's class of risk as of the Policy Date; the number of years that the policy has been in force; and the Insured's attained age.
>
> A table of guaranteed maximum monthly deduction rates for the base policy is shown in the Policy Data. We may use rates lower than these guaranteed maximum monthly deduction rates. We will never use higher rates.
>
> ***
>
> Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.
>
> ***
>
> **Who Can Make Changes in the Policy** -- Only our President or a Vice President together with our Secretary have the authority to make any changes in this policy. Any change must be in writing.

SGD No. 9; Dkt. 152-3 ("Specimen Policy") at 14, 22, 23, 25. The "Policy Data" section of the Policies provides a table of guaranteed MDRs for the first five policy years and guaranteed maximum MDRs for each year thereafter. The "Policy Data" section also states, "CURRENT MONTHLY DEDUCTION RATES ARE NOT GUARANTEED AFTER POLICY YEAR 5, NOR ARE THEY ESTIMATES FOR THE FUTURE." Specimen Policy at 10.

### B. Negotiation of the Policies

The parties dispute many of the facts relating to the negotiation of the Policies insofar as negotiations took place between Transamerica and Hardwick (acting on behalf

**[REDACTED] CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|----------|--------------------------|------|----------------|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

of the PIC entities). It is undisputed that Joel Seigle, then Senior Vice President of Life Product Marketing for Transamerica, and Ed Carey, a former Product Manager in Transamerica's Life Products Department that is now deceased, met at least once with Hardwick and that the three were all engaged in negotiations of the prospective PIC-owned policies.

Plaintiffs contend that Transamerica repeatedly assured Hardwick that it would not raise the Policies' MDR at any time in the future. Hardwick repeatedly testified during his deposition that he was told the MDR would not increase. For example, Hardwick testified as follows:

> [Q.] I'm asking you, Pastor: Did someone from Transamerica say: Pastor, we will never ever raise the rates, or did they say we don't currently intend to raise the rates?
> A. They said we have not raised the rates in 30 years.
> Q. Yep.
> A. And we're not going to raise the rates during your lifetime.

Hardwick Depo. At 54:20-55:3. Hardwick further testified:

> Q. And did anybody ever say that the cost of insurance could go up?
> A. No. We asked that, they said it hadn't gone up in 30 years.
> Q. Right. And did they ever tell you that Transamerica had no right to increase the cost of insurance in the future?
> A. I wouldn't have took the insurance if they'd have said yes, if they had the right. I -- I had to depend on people to pay the insurance.

Id. at 48:21-49:1.

During the negotiation of the Policies, Hardwick became concerned that Transamerica was seeking to exploit his congregants by charging them more for the Policies than other similar insureds. During his deposition, Hardwick explained his concern about "red-lining" whereby the insurance company would charge certain neighborhoods or races more for the same insurance because the potential insureds, his congregants, were African American. Hardwick testified, "we were adamant that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

[REDACTED] CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

Transamerica would not pull that on this community.  We tried to be . . . they assured us that we would be treated like everybody else."  Hardwick Depo. at 31:15-32:21.

In response to Hardwick's concerns, on September 10, 2003, Seigle wrote a letter to Hardwick which stated the following:

> Please be assured that this is the same product that would be available for any similar group that might apply for coverage. The internal charges, benefits and features are exactly the same as we would issue in all states where the policies have been approved, which at this point is all states except for New York where we are not licensed to conduct business.

> In addition, please understand that for us to charge different rates based on anything other than the normally accepted insurance categories of gender, smoker status, and age, would be an unacceptable business practice under the corporate principles by which we operate as well as standard insurance regulations.

SGD No. 11.

It is undisputed that Hardwick signed "a variety of documents acknowledging" that the existing MDR was not guaranteed and could increase in the future.  SGD No. 27.  For example, on June 4, 2002, Hardwick was asked to complete a questionnaire.  The questionnaire included the following questions:

> Is the proposed policyholder and any other participant in the transaction aware of the fact that the insurance policies have guaranteed and non-guaranteed elements. That only the value and benefits in the columns label "At the Guaranteed Interest Rate and Guaranteed Monthly Deductions" represent amounts actually guaranteed under the contract for the premiums shown in the illustrations presented to the proposed policyowner?

> Is the proposed policyowner and any other participant in the transaction aware that changes to current interest rates or policy charges may result in

**[REDACTED] CIVIL MINUTES – GENERAL**　　'O'

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|----------|--------------------------|------|----------------|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

additional premium payments being required to keep the policy(ies) in
force?

[5]SGD No. 28. In response to both questions, Hardwick circled "Yes." Dkt. 169-3,
Zebrowski Declaration Exhibit 5. Similarly, on February 27, 2004, Hardwick signed a
Letter of Confirmation which stated:

> The [PIC] understands that except as stated in the TV Policy, the policy
> charges and credited interest rates included in each individual policy are **not
> guaranteed** by [Transamerica] and are subject to change as determined by
> [Transamerica].
> (Emphasis in original.)
>
> Monthly deductions may be increased or decreased based on
> [Transamerica's] expectations for the
> future, subject to stated policy limits.
>
> The [PIC] understands and agrees that [Transamerica] makes no
> representations or warranties with regard to the proposed insurance program
> . . . except for benefits and features that are specifically guaranteed in the
> [Policies].

SGD No. 29. No later than September 16, 2003, Hardwick received a copy of the Policy
language.

In 2009, DCD took over paying all of the Policies' premiums in exchange a large
share of any death benefits paid. The relevant facts relating to DCD's involvement and
the negotiations with DCD are largely undisputed. At an unspecified time, Rosenfeld
engaged Scott Rose, an insurance consultant, to advise him regarding a potential

---

[5] Insofar as Hardwick agreed that "any other participant in the transaction" was
aware of the guaranteed and non-guaranteed elements, it is unclear whether Hardwick
was signing on behalf of both PIC entities and/or DCD. Nor is it clear what was relayed
to DCD in relation to this document.

**[REDACTED] CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|----------|--------------------------|------|----------------|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

investment in the Policies. Before Rosenfeld invested in the Policies, Rose told Rosenfeld that the cost of insurance could go up so long as it went up for all similarly situated policyholders. Rosenfeld also reviewed a copy of the Policy language. It is undisputed that no one ever told Rosenfeld that the MDR would never be increased. Because DCD receives a portion of any death benefit, higher mortality among the insureds results in accelerated returns for DCD and lower requisite premiums overall. Rose conducted an analysis of the prospective Policies and determined that an investment in the Policies would be favorable for Rosenfeld, in part, because the insureds, particularly the African-Americans among the insureds, had a worse mortality experience than the population at large. Before investing, Rosenfeld determined that death benefit payments would exceed insurance premium payments by between $110 million and $220 million over the life of the Policies.

### C. The MDR Increase Decision

The Policies were initially reinsured by Transamerica using reinsurance programs in place for corporate-owned life insurance policies ("COLI"). There is evidence suggesting[6] that, by at least 2007, Transamerica discovered that the Policies did not comply with all of their reinsurers' requirements. For example, one reinsurance program required **[REDACTED]**. Dkt. 219-21 at 3. **[REDACTED]**. Id. Thus, in 2007, Transamerica **[REDACTED]**. Dkt. 219-32.

Notwithstanding the 2007 recapture, some of the Policies' risk remained reinsured through North American National ReInsurance Company ("NANRe"). In October 2010, NANRe notified Transamerica that it intended to "substantially increase reinsurance rates on the [Policies]." Dkt. 211-1, Herman Decl. Ex. 40. NANRe proposed that Transamerica increase MDRs by 80 percent in light of the mortality experience of the Policies. Dkt. 244-4, Danny Mahoney Deposition Transcript ("Mahoney Depo.") at 49:7-16.

---

[6] The Court cannot discern whether Transamerica disputes plaintiffs' factual assertions about Transamerica's reinsurance.

**[REDACTED] CIVIL MINUTES – GENERAL**    **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|----------|--------------------------|------|----------------|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

In 2012, Danny Mahoney, an actuary employed by Transamerica, examined whether Transamerica could **[REDACTED]**. However, Mahoney concluded **[REDACTED]**. Dkt. 219-37.

At an unspecified time in 2012, Mahoney examined the profitability of the Policies.[7] It is undisputed that Mahoney reviewed all death claims over the prior life of the Policies and found that there were either 11 or 12 claims each year other than one in which there were 9. SGD No. 33. Mahoney also examined census data on those insured by the Policies,[8] id. No. 35, and current lapse and interest rate expectations, id. No. 37. Mahoney then projected the future income, benefits and expenses for the Policies at the existing MDRs. Id. No. 34. Mahoney avers that he concluded, "a reasonable future mortality projection would be approximately 12 death claims in the first projection year." Dkt. 150, Declaration of Danny Mahoney ("Mahoney Decl.") ¶ 7. Plaintiffs dispute Mahoney's conclusion and argue that he reverse-engineered a death claim projection in order to support an MDR increase. In support of their argument, plaintiffs rely, principally upon two emails Mahoney sent in 2012. On October 29, 2012, Mahoney emailed colleagues about preparing for a meeting in mid-November. His email stated:

**[REDACTED]**

---

[7] The parties appear to agree that Mahoney only considered data relating to the Policies and did not consider data relating to 1,008 similar policies issued to members of the Stockton Christian Ministry on March 13, 2002 (the "Stockton Policies"). See Dkt. 230-6, Reply Declaration of Tracy Collins ("Colins Reply Decl.") ¶ 2; Reply at 10. According to Collins, by November 30, 2009, two of the Stockton Policies had been surrendered, 975 of the Stockton Policies had lapsed. Id. ¶ 3. Twenty-four of the Stockton Policies terminated due to the death of the insured prior to January 4, 2012, and seven of the Stockton Policies remain in force today. Id.

[8] This fact is undisputed, but it is unclear what census data Mahoney relied upon or how he "considered" it. During oral argument, defense counsel indicated that the census data at issue stated whether each insured was alive, their age, their sex, and whether they were a smoker or non-smoker.

[9]Dkt. 219-37, Herman Decl. Ex. 46.  On November 9, 2012, Mahoney sent an email stating:

**[REDACTED]**

[10]Dkt. 219-38, Herman Decl. Ex. 47.

Using Mahoney's assumption of 12 claims per year, Mahoney projected that Transamerica would lose money on the Policies in the future.  Mahoney calculated that it would take a 77% increase in the MDR in order to earn 7.7% annually on a prospective basis when discounted at an 11% rate to determine present value.  Mahoney also calculated that a 50% increase in the MDRs would cause the Policies to break even prospectively (when discounted at an 11% rate).  During his deposition, Mahoney testified that his goal was not to "reverse engineer" a particular MDR increase, but to come to an "independent conclusion" regarding how large of an MDR increase was appropriate.  Mahoney Depo. 198:5-9.

Transamerica decided to impose a 50% MDR increase on the Policies.  The 50% increase was the first time Transamerica has increased MDRs on the Policies.  Notwithstanding the 50% increase, the MDR remains below the guaranteed maximum MDR on all of the Policies.  Transamerica contends that the MDR increase not only affected the Policies, but also affected "all policies that were issued on a conditionally guaranteed basis using TransValue policy form NMUL-PC."  SGD No. 43.  However, plaintiffs contend, and Transamerica does not appear to dispute, that **[REDACTED]**.  See Dkt. 244-6, Herman Decl. Ex. 52.

---

[9] It is unclear from the parties' briefing what a "C2" factor is.

[10] Transamerica originally objected to consideration of both these exhibits because they are inadequately authenticated.  See Dkt. 230-2.  However, plaintiffs' appear to have cured the defect identified by Transamerica insofar as Herman contends that Exhibits 46 and 47 to his declaration were produced during discovery by Transamerica.  See Herman Decl. ¶ 72.  Defendant does not appear to dispute that it produced these exhibits during discovery, thus any remaining objection to their consideration is overruled.

**[REDACTED] CIVIL MINUTES – GENERAL**        **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

### D.    Notice of the MDR Increase

Each month, Transamerica sends a Notice of Payment Due ("Notice") for each of the two policy pools. The February 2013 Notice indicated minimum monthly premium payments of $77,393.39 to keep Pool 1 Policies in force and $73,445.42 for Pool 2. The March 2013 Notice stated that the minimum monthly premium payments were $116,179.82 for Pool 1 and $110,544.88 for Pool 2.

Transamerica also sends out a Statement of Policy Value ("Statement") each year. On page one of the Statement regarding the period from November 9, 2012, to November 9, 2013 (the "2013 Statement"), the 2013 Statement provide:

**[REDACTED]**

Dkt. 169-10 at 261. Two pages later, the 2013 Statement provided:

**[REDACTED]**

Id. at 263. The final sentences, commencing **[REDACTED]** had not been included in prior Statements. The parties appear to agree that the preceding language of the 2013 Statement was, in pertinent part, identical to prior Statements.

Since the MDR increase, DCD has continued to pay the heightened MDRs.

## III.   LEGAL STANDARDS

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

[REDACTED] CIVIL MINUTES – GENERAL     'O'

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the evidence presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See Matsushita, 475 U.S. at 587.

## IV.    DISCUSSION

### A.    Standing

Transamerica argues that it is entitled to summary judgment in relation to Hardwick's and PIC LLC's (the "PIC Plaintiffs'") claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation because each requires proof of damages and the PIC Plaintiffs suffered no damages. The Court agrees.

Transamerica offers evidence that the PIC Plaintiffs assigned **[REDACTED]**. Dkts. 169-14; 169-15. The assignments indicate that the PIC Plaintiffs assigned to DCD:

**[REDACTED]**

**[REDACTED] CIVIL MINUTES – GENERAL**     'O'

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

Id. It is undisputed that these assignments were made in order to protect DCD's investment in the Policies and that the PIC Plaintiffs have never paid any premiums towards the policies.

A party moving for summary judgment bears the burden of providing evidence to negate an essential element of the nonmoving party's claim, or alternatively, showing "an *absence* of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325 (emphasis added). When an absence of evidence is shown, the burden shifts to the nonmoving party to demonstrate the "existence of [that] essential element." Id. at 317. Here, Transamerica has done both – it has shown an absence of evidence and offered evidence demonstrating why there is no evidence of damages to the PIC Plaintiffs. Thus, the burden shift to the PIC Plaintiffs to demonstrate a material issue of disputed fact regarding their damages. Plaintiffs have failed to meet this burden.

Plaintiffs argue that but for Transamerica's alleged misrepresentations to Hardwick, the PIC Plaintiffs would not have opted to proceed in obtaining the Policies, see Hardwick Depo. 48:11-25, and that the MDR increase means **[REDACTED]**, dkt. 219-52, Declaration of Vincent Granieri ("Granieri Decl.") ¶ 19. However, even if both of the foregoing statements is true, neither is evidence of damages to the PIC Plaintiffs as a result of the MDR increase. The record evidence demonstrates that Hardwick's congregants have received their partial death benefits in the past pursuant to an agreement with DCD and, thus far, have continued to receive those benefits because DCD has continued to pay premiums. Insofar as the Policies are no longer a good investment for DCD (or any other prospective investor), the PIC Plaintiffs have not explained how such a result has caused them damages. In the SGD, the PIC Plaintiffs appear to contend that they still own an interest in "the initial Fifty Thousand Dollars ($50,000) of proceeds from each of the Policies," as tenants-in-common with DCD by virtue of an agreement with DCD. SGD No. 91. However, the PIC Plaintiffs have not presented evidence that the MDR increase caused damage to those interests or otherwise harmed the PIC Plaintiffs.

In light of the foregoing, there are no material issues of disputed fact regarding the PIC Plaintiffs damages from breach of contract, breach of the implied covenant of good faith and fair dealing, tortious breach of the implied covenant of good faith and fair dealing, or negligent misrepresentation. There is no evidence of damages to the PIC

**[REDACTED] CIVIL MINUTES – GENERAL**    **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

Plaintiffs in relation to these claims and Transamerica is entitled to summary judgment on that basis.

Transamerica makes a similar argument about the PIC Plaintiffs' UCL claim. "A UCL action is equitable in nature; damages cannot be recovered." Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 943 (Cal. 2003). Thus, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." Id. In order to have standing to bring a UCL claim, the plaintiff must have "suffered injury in fact and [] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. "Interpreting this statutory language—which California voters added to the UCL in 2004 through the passage of Proposition 64, see In re Tobacco II Cases, 46 Cal. 4th 298, 314 (2009)—California courts have held that when the 'unfair competition' underlying a plaintiff's UCL claim consists of a defendant's misrepresentation, a plaintiff must have actually relied on the misrepresentation, and suffered economic injury as a result of that reliance, in order to have standing to sue." In re iPhone Application Litig., 6 F.Supp.3d 1004, 1013 (N.D. Cal. 2013) (Koh, J.) (emphasis added).

In the SAC, plaintiffs request that the Court "order restitution be paid by Transamerica for premiums and other amounts wrongfully acquired, obtained, and collected as a result of the wrongful and unlawful increase in the Monthly Deductions." SAC ¶ 87. The only money that plaintiffs contend has been wrongfully acquired is the money paid in premiums. Plaintiffs contend that they would never have paid any premiums, but for Transamerica's initial misleading sales pitch, and would have paid lower premiums, but for the subsequent MDR increase. However, it is undisputed that the PIC Plaintiffs did not pay any of the premiums on these Policies. In order to seek restitution under the UCL, the aggrieved party must seek the return of money or property once in its possession or the payment or return of property in which the aggrieved party has a vested interest, but which defendant has wrongfully acquired or retained. Korea Supply Co., 63 P.3d at 947. Whatever interest the PIC Plaintiffs retain in certain death benefits as tenants-in-common with DCD, there is no evidence that Transamerica has wrongfully acquired that interest – the MDR increase did not alter the relationship between the PIC Plaintiffs and DCD. Thus, having failed to present evidence of damages, the UCL does not provide an alternative basis for any relief sought by the PIC Plaintiffs. See id. at 948 ("the UCL is not an all-purpose substitute for a tort or contract action." (quotation marks omitted)).

**[REDACTED] CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

In light of the foregoing, the PIC Plaintiffs cannot proceed to trial on their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, or the violation of the UCL. In relation to the foregoing claims by the PIC Plaintiffs, Transamerica's motion for summary judgment is **GRANTED**.

### B.     Breach of Contract

To prove breach of contract, a party must show the existence of a contract, his or her performance of the contract or excuse for nonperformance, the defendant's breach, and resulting damage. <u>Vaccarino v. Midland Nat. Life Ins., Co.</u>, 2011 WL 5593883, at *7 (C.D. Cal. Nov. 14, 2011) (citing <u>Wall St. Network, Ltd. v. N.Y. Times Co.</u>, 164 Cal. App. 4th 1171, 1178 (2008)). Transamerica contends that plaintiffs cannot prove breach.

DCD alleges that Transamerica breached the Policies by: (1) increasing MDRs to increase profitability, and recoup past losses, rather than address unexpected future costs, SAC ¶ 63; and (2) increasing MDRs because the insureds are African-American, <u>id.</u> ¶¶ 61, 63.[11] As discussed below, both of these theories are predicated upon the same duty

---

[11] The Policies provide that, "[t]he monthly deduction rate for the base policy will depend [in part] on . . . the Insured's *class of risk* as of the Policy Date." Specimen Policy at 22. The FAC alleged a breach of this provision; however, the on August 24, 2015, the Court ruled, "to the extent plaintiffs argue that defendants must charge the same rates to policyholders with identical risk classifications across *all* of their policies, they have failed to state a valid theory for breach of contract," and dismissed any such theory without prejudice. Dkt. 39 at 9. Plaintiffs reasserted an analogous claim for breach in the SAC. <u>See</u> SAC ¶ 61. However, in its December 23, 2015 order regarding Transamerica's motion to dismiss the SAC, the Court did not specifically address whether plaintiffs had cured the deficiency identified in the FAC. <u>See</u> Dkt. 48 at 9-10 ("Accordingly, because plaintiffs have pled at least two viable theories for breach of contract in the SAC, the Court DENIES defendants' motion to dismiss plaintiffs' claim for breach of contract."). Neither party mentions a purported breach of this Policy provision here. For the reasons identified in the Court's August 24, 2015 order, the Court rules here that the Policies do not require Transamerica to charge all members of the same risk-class (e.g. smokers versus non-smokers) the same MDRs. Insofar as plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**[REDACTED] CIVIL MINUTES – GENERAL**        **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

under the Policies – Transamerica's duty to only increase MDRs based upon its expected future costs.

The Policies provide that any MDR increase must be "prospective" and "subject to [Transamerica's] expectations as to future cost factors," such as mortality. Specimen Policy at 23. They further require that Transamerica "not distribute past surplus or recover past losses by changing the monthly deduction rates." Id. at 35. Transamerica contends that, in reliance upon Mahoney's work, it increased MDRs based upon its anticipated future mortality costs incurred under the Policies and only to the extent that the MDR increase would render the Policies a break-even venture going forward. Thus, according to Transamerica, the MDR increase did not breach the Policies.

However, material issues of disputed fact preclude summary judgment on the foregoing basis. DCD has offered evidence suggesting that Mahoney's work was an attempt to reverse-engineer an MDR increase that would satisfy Transamerica's reinsurer, NANRe, rather than a good faith effort to estimate future costs. At the time, Mahoney stated that, in anticipation of a meeting about the MDRs, he needed to **[REDACTED]**. To accomplish this goal, he proposed **[REDACTED]**. Mahoney later explained, **[REDACTED]**. DCD has also offered evidence that the scale of the MDR increase was being driven, at least in part, by **[REDACTED]**.

The simplicity of Mahoney's purported prospective mortality estimate (twelve claims per year) lends further support to DCD's contention that Mahoney's work was

---

persist in this claim, the Policy language does not support it and the Court **GRANTS** summary judgment in favor of Transamerica.

Plaintiffs also allege that Transamerica breached the Policies by increasing the MDR and MEC above guaranteed maximum rates, see SAC ¶¶ 62, 64, and by failing to make required disclosures about any MDR increase, id. ¶ 65. However, plaintiffs appear to have abandoned these allegations. See SGD No. 44 (undisputed that the MDRs remain below guaranteed maximums); SGD No. 75 (undisputed that Transamerica has "never increased the MEC on the Policies."); Opp'n Memo (silent as to any disclosures required by the Policies). Thus, Transamerica's motion for summary judgment is **GRANTED** as it relates to these alleged breaches.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

[REDACTED] CIVIL MINUTES – GENERAL    'O'

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

*designed* to result in a substantial MDR increase rather than intended to determine Transamerica's true expectations about future mortality. Mahoney testified during his deposition that he was asked to "refine the mortality assumption," meaning that he developed a measure of how the Policies were performing without reference to any "previous mortality assumption used for these policies." Mahoney Depo. at 43:5-44:2. Additionally, Transamerica's Chief Actuary testified that **[REDACTED]**. Dkt. 244-5 at 64:14-65:23. However, Mahoney did not consider data from the mortality experience of the Stockton Policies. Transamerica acknowledges that the Stockton Policies experienced on 24 deaths in a nearly 10-year period, far fewer than it assumed it would experience prospectively for PIC Policies.[12]

The Policies require Transamerica to base any MDR increase upon its expectations regarding the cost of insurance in the future. However, there is nothing in the Policies to suggest that the word "expectations" includes *any* calculation Transamerica might posit about mortality, even if the calculation is motivated by something other than a change in mortality. DCD contends that Transamerica contrived a basis for increasing the MDR that was unrelated to its "expectations." There is a material issue of disputed fact regarding whether the MDR increase was predicated upon Transamerica's *true expectations* about mortality in relation to its pricing assumptions or merely a calculation *contrived* to justify an increase of a certain magnitude and thereby increase profits. The Policies do not permit the latter.

Insofar as race relates to this case, Transamerica contends:

---

[12] Transamerica's assertion that the Stockton Policies could not inform *future* mortality because none was in-effect at the time of the MDR increase, see Reply at 10, is belied by its Chief Actuary's testimony and Mahoney's methodology. Mahoney predicated his calculations on data from *past mortality experience*. In other words, Mahoney looked at data from *policies that were no longer in force* because the insured had died and assumed that future performance would match past experience. Mahoney's prospective analysis appears to have been solely based upon the behavior of policies that were no longer in force. Thus, it is therefore no answer to distinguish the Stockton Policies simply because they were no longer in force.

[REDACTED] CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. |

"[i]t is hornbook law that the mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened because the person is a member of that racial group." Plaintiffs offer nothing "more."

Reply at 6 (quoting <u>Mora v. US Bank</u>, No. 15-cv-02436-DDP, 2015 U.S. Dist. LEXIS 97731, at *24 (C.D. Cal. July 27, 2015) (a case about pleading a claim for discrimination under the Equal Credit Opportunity Act)). At bottom, Transamerica argues that plaintiff cannot proceed with their claim that the MDR increase was racially motivated because no employee of Transamerica has stated that they were motivated by or expressly considered the insureds' race. <u>See</u> Reply at 7 ("Proof of discriminatory motive is critical" (quoting <u>Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.</u>, 135 S. Ct. 2507 (2015) (a case evaluating whether disparate impact claims are cognizable under the Fair Housing Act)).

However, Transamerica misunderstands the question presented by DCD's breach of contract claim. The claim is not predicated upon the Fair Housing Act or Equal Credit Opportunity Act – it is predicated upon the Policies. The Policies require that any MDR increases to be based upon Transamerica's expectations regarding future *costs*. Although the Policies do not permit racially-motivated MDR increases, because race is not a prospective cost – DCD will not be required to prove that Transamerica was motivated by racial animus in order to succeed in their breach of contract claim.

Instead, DCD must prove Transamerica breached a contractual duty. As pertinent here, DCD contends that Transamerica was *not* motivated by its expectations as to future costs when it increased the MDR. Thus, the trier of fact will be asked to determine whether the MDR increase was motivated by Transamerica's expectations about future costs – not whether plaintiff proved any specific alternative motivation. As discussed above, Transamerica has not presented undisputed evidence that the MDR increase was based upon its expectations as to future costs. That alone precludes summary judgment regarding DCD's breach of contract claim. Insofar as DCD may seek to prove that the insureds' race, rather than cost expectations, had an effect upon Transamerica's decision

**[REDACTED] CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

to increase the MDRs, DCD has presented *some* evidence here supporting such an inference.[13]

In light of the foregoing, Transamerica's motion for summary judgment is **DENIED** with respect to DCD's breach of contract claim.[14]

### C.     Breach of the Implied Covenant of Good Faith and Fair Dealing

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  <u>Carma Developers (Cal.), Inc. v. Marathon Dev. Cal.,</u>

---

[13] Hardwick testified that he expressed concerns to Transamerica that the insureds receive a policy no different from those issued to others of different races and that Transamerica said any future MDR increases would apply to "everyone, not just for your African-American community." Hardwick Depo. 39:12-17.  Notwithstanding those representations, the Policies comprised 97.5% of the group affected by the MDR increase – suggesting that Transamerica either sold plaintiffs a unique product that was not available to others or that Transamerica treated plaintiffs' policies differently from other similarly situated policies.  There is evidence suggesting that, in the process of deciding how much to increase the MDR, Transamerica disregarded data relating to the similar Stockton Policies, focused exclusively upon data relating to these Policies, was aware the Policies insured racial minorities, and took into consideration unidentified "census data" in pursuit of a justification for a high increase in MDRs targeting the PIC Policies.  In the approximately twenty years preceding this MDR increase, plaintiffs offer evidence suggesting Transamerica had only increased any MDRs **[REDACTED]**.  Dkt. 219-44. Thus, there is evidence to suggest that the scale of the MDR increase on these Policies and the manner in which Transamerica isolated these Policies for an MDR increase were both unique.

[14] Insofar as Mahoney's methodology presents material issues of disputed fact about the proper assumptions and Transamerica's motivations, Transamerica's claim that the MDR increase rendered the Policies a break-even prospect also presents material issues of disputed fact.  Thus, Transamerica has not demonstrated by undisputed evidence that it did not increase the MDR in order to recoup past losses and the motion is **DENIED** with respect to that alleged breach.

Inc., 2 Cal. 4th 342, 371-72 (1992). Notwithstanding, the covenant of good faith may not "prohibit a party from doing that which is expressly permitted by an agreement." Id. at 374. However, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." McNeary-Calloway v. JP Morgan Chase Bank, N.A., 863 F. Supp. 2d 928, 956 (N.D. Cal. 2012) (quoting Perdue v. Crocker Nat'l Bank, 38 Cal. 3d 913, 923 (1985)).

Defendant contends that it is entitled to summary judgment regarding DCD's breach of the implied covenant of good faith and fair dealing claim because the Policies expressly permitted Transamerica to increase the MDR in the manner that it did so. Defendant is incorrect because, as set forth above, there are material issues of disputed fact regarding whether the MDR increase here was permissible under the Policies' language.

Additionally, as the Court has previously ruled in this case, the Policies here limit Transamerica's discretion to increase the MDR to consideration of "cost factors." Dkt. 48 at 13. Even though Transamerica appears to retain some discretion in determining its own expectations about future costs, that does not mean, for instance, that it can contrive baseless or implausible expectations about the future simply to increase the MDR in a manner it would prefer. See U.S. Bank National Association v. PHL Variable Life Insurance Company, 2015 WL 3932791, *2 (S.D.N.Y. Jun. 22, 2015) ("While the policies provide [insurer] bounded discretion in setting insurance rates, there is no language suggesting that Phoenix was free to set rates as it please subject only to the express limitations in the contract.").

Transamerica's motion for summary judgment regarding DCD's claim for breach of the implied covenant of good faith and fair dealing is **DENIED**.

## D.    Tortious Breach of the Duty of Good Faith and Fair Dealing

A breach of the implied covenant of good faith in an insurance contract can give rise to an action in either contract or tort. See Archdale v. American Intern. Specialty Lines Ins. Co, 154 Cal. Rptr. 3d 632, 648 (2007) (remedy for breach of the implied covenant "sounds in both contract and tort."). However, to bring an action in tort a

**[REDACTED] CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
| --- | --- | --- | --- |
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

plaintiff must allege that benefits due under the policy have been improperly withheld. See Benavides v. State Farm Gen. Ins. Co., 136 Cal. App. 4th 1241, 1250 (2006) ("[T]he essence of the tort of the implied covenant . . . is focused on the prompt payment of benefits under the insurance policy, there is no cause of action…when no benefits are due."). Tort damages may not be recovered merely because an insurer charged excessive premiums unrelated to its claim handling. Jonathan Neil & Assocs., Inc. v. Jones, 33 Cal. 4th 917, 938-41 (2004); Tilbury Constructors, Inc. v. State Comp. Ins. Fund, 40 Cal. Rptr. 3d 392, 401 (2006) (tort claim lies where "the overcharging of premiums was inextricably linked to the mishandling of claims—precisely the kind of bad faith behavior that goes to the heart of the special insurance relationship and gives rise to tort remedies," not where the premium overbilling is "separate from any allegations of claims mishandling").

In its motion to dismiss, Transamerica argued that plaintiffs could not bring a claim sounding in tort because their claim was in the nature of a dispute about premiums and they had not been denied any benefit under the Policies. Insofar as DCD contends that it is being denied Accumulation Value, Transamerica argued that DCD is an investor-owner who has continued to pay premiums without any actual reduction in Accumulation Value. The Court previously rejected this argument, reasoning, in part:

> The Court recognizes that DCD Partners has continued to pay premiums at a higher rate. Nonetheless, while defendants may contend that DCD Partners' increased premiums reduce the likelihood of a diminution in the Accumulation Value Account, at the motion to dismiss stage the Court must take plaintiffs assertions as true and plaintiffs need only state a claim that is "plausible." Plaintiffs have alleged that there has been a diminution in the Accumulation Value Account which reduces the potential for plaintiffs to earn interest and receive cash from the accounts. Furthermore, plaintiffs have alleged that the monthly deduction from the Accumulation Value account has more than doubled. Therefore, the Court finds that plaintiffs have stated a plausible claim that defendants wrongfully denied them a benefit due under the policy.

Dkt. 48 at 15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

[REDACTED] CIVIL MINUTES – GENERAL      'O'

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

Transamerica has renewed its argument here and filed a declaration from Tracy Collins, an Inforce Management Analyst for Transamerica, to support the argument. See Dkt. 148, Tracy Collins Declaration ("Collins Decl."). Collins claims that DCD has always minimally funded the Policies. Id. ¶ 4. In other words, Collins claims that the investor-owners pay at or near the minimum premiums to keep the Policies in force. Therefore, she explains, the Policies have little, if any, Accumulation Value. Id. DCD has never attempted to borrow against the Accumulation Values or sought to surrender any Policy for cash value. Id. ¶¶ 4-5. In opposition to the motion, DCD has not presented any evidence rebutting Collins' explanation of the Policies' Accumulation Values, nor do they direct the Court to other benefits denied by Transamerica. Although the Court rejected Transamerica's argument about Accumulation Values at the pleading stage, there is now undisputed evidence to support it. Accordingly, the Court concludes that this case is in the nature of a premiums dispute wherein DCD has not been denied a benefit due under the Policies.[15]

Transamerica's motion for summary judgment on DCD's tort claim is **GRANTED**.

### E.    Negligent Misrepresentation

The elements of negligent misrepresentation are '(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact

---

[15] The Court does not reach the question whether there may be a set of circumstances under which a tort claim could be predicated upon a wrongful increase in in the cost of insurance. Critically here, plaintiffs have not offered evidence that the MDR increase resulted in any policy lapse or denial of death benefits. Instead, plaintiffs rest their tort claim on the purported denial of accumulation value; however, plaintiffs have failed to demonstrate a material issue of disputed fact about the accumulation values – accumulation values were at or near zero before the MDR increase and remained there after the MDR increase because DCD has never paid more in premiums than necessary to keep the Policies in force.

**[REDACTED] CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

misrepresented, (4) justifiable reliance on the misrepresentation, and (5)
resulting damage.

<u>Wells Fargo Bank, N.A. v. FSI, Fin. Sols., Inc.</u>, 127 Cal. Rptr. 3d 589, 600 (2011).

      The Court has already found that the PIC Plaintiffs cannot prove damages resulting
from any representations by Transamerica. DCD's claim for negligent misrepresentation
appears to fail for a different reason – DCD presents no evidence of a misrepresentation
to DCD or justifiable reliance by DCD. Plaintiffs' claim for negligent misrepresentation
appears to be predicated upon Transamerica's representations to *Hardwick* before the
Policies issued about whether the MDR could ever change and whether Transamerica
would target changes at the Policies, in isolation. <u>See</u> Opp'n Memo at 22-23. Even if
Transamerica made statements to Hardwick that were false, there is no evidence that
DCD was aware of those statements or relied upon them in its investment decision. On
the contrary, the undisputed evidence demonstrates that DCD was aware that the MDR
was not guaranteed after the first five years and might change.

      During oral argument, the Court directed plaintiffs to identify the basis for DCD's
negligent misrepresentation claim. Plaintiffs' counsel stated that DCD relied upon two
types of alleged misrepresentations. First, DCD allegedly relied upon representations in
an unspecified policy illustration originating with Transamerica. Second, plaintiffs'
counsel argued that Hardwick and an unidentified "second investor" in the Policies, made
representations to DCD based upon Transamerica's representations to them.

      Plaintiffs have not directed the Court to evidence relating to either of these
purported types of representations to DCD. Although the parties' briefing does not
explain the history of DCD's investment in the Policies, during oral argument the parties
appeared to agree that DCD was the third investor in the Policies, having taken over
premiums in 2009, and that Rosenfeld first purchased DCD in 2011. During oral
argument, defense counsel indicated that "DeHaven" was the prior owner of DCD. The
only reference to DeHaven in the evidence submitted here appears to be Rosenfeld's
deposition testimony, wherein the following exchange occurred:

**[REDACTED] CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

> [Q:]   In between the time you bought RJC and the time you acquired Premae's interest in DCD, did you talk with anybody else at all about whether the cost of insurance could increase?
>
> A.     The only person who -- who said anything about that, I believe, was Jeffrey DeHaven.
>
> Q.     And what did DeHaven say?
>
> A.     He kind of echoed what the reverend had said, is that the -- that the premiums could not be increased more than the scheduled estimated rates in the illustrations unless all policies of – of similar nature were raised throughout.

Dkt. 152-22 at 25:15-26:1. The foregoing deposition testimony appears to provide the basis for plaintiffs' argument regarding misrepresentations to DCD.[16]

In support of its motion, Transamerica has submitted two "Composite Life Insurance Illustration[s]," which state that they were prepared *for* PIC, dated May 6, 2004, and April 29, 2005, respectively. See Dkt. 169-16 (the May 6, 2004 illustration); Dkt. 169-4 (the April 29, 2005 illustration). Both of these illustrations appear to have been signed by Hardwick and not by DCD. Plaintiffs have not directed the Court to any evidence that DCD relied upon either of these illustrations, which were evidently produced several years before DCD invested in the Policies. However, assuming arguendo that DCD saw and relied upon either or both of these illustrations, neither supports DCD's claim for negligent misrepresentation. On the first page of both documents, they state:

> **THIS IS AN ILLUSTRATION ONLY. AN ILLUSTRATION IS NOT INTENDED TO PREDICT ACTUAL PERFORMANCE. INTEREST**

---

[16] It is unclear whether DeHaven was the unspecified "second investor" to which plaintiffs' counsel refers. Although plaintiffs' counsel offered an explanation of DCD's negligent misrepresentation claim during oral argument, plaintiffs have not directed the Court to any evidence relating to that claim. The Court assumes, for purposes of this order, that the "second investor" was DeHaven. The Court can discern no evidence relating to any other prior investors or any other parties who may have communicated alleged misrepresentations to Rosenfeld.

**[REDACTED] CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

> **RATES, DIVIDENDS OR VALUES THAT ARE SET FORTH IN THE ILLUSTRATION ARE NOT GUARANTEED, EXCEPT FOR THOSE ITEMS CLEARLY LABELED AS GUARANTEED.**

Id. (emphasis in original). Thereafter, both illustrations state:

> CHANGES TO THE CURRENT INTEREST RATE OR POLICY CHARGES MAY RESULT IN ADDITIONAL PREMIUM PAYMENTS BEING REQUIRED TO KEEP THE POLICY IN FORCE.
>
>           * * *
>
> Only the values and benefits in the columns labeled "At the Guaranteed Interest Rate and Guaranteed Monthly Deductions" represent amounts actually guaranteed under the policy for the premiums shown. The columns labeled "At Non-Guaranteed Interest Rate and Non-Guaranteed Monthly Deductions" reflect interest rates that are equal to or more conservative than what the company is currently crediting, and monthly deductions which are equal to or more conservative than what the company is currently charging. These columns present values, benefits, interest rates and charges which are not guaranteed and are subject to change. . . . This illustration is intended to assist you in understanding how the policy works, not to predict actual performance. Actual results are likely to be different from and may be more or less favorable than those shown in this illustration.

Id. Neither illustration states that the MDR is guaranteed; nor is it clear how plaintiffs contend that these illustrations were false or misleading. Even if DCD saw and relied upon these illustrations, it could not have justifiably concluded that the MDR was guaranteed at a certain rate below the guaranteed maximum MDR.

With respect to personal communications occurring outside of the foregoing illustrations, plaintiffs' evidence is insufficient to demonstrate a material issue of disputed fact for two reasons. First, the parties appear to agree that Bily v. Arthur Young & Co., 3 Cal. 4th 370, 408, 834 P.2d 745 (1992), as modified (Nov. 12, 1992), is the controlling case on whether a negligent misrepresentation claim can be based upon

**[REDACTED] CIVIL MINUTES – GENERAL**　　　**'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

defendant's representations to a third-party.[17]  In Bily, the California Supreme Court held that "the person or class of persons entitled to rely upon the representations is restricted to those *to whom or for whom the misrepresentations were made.*  Even though the defendant should have anticipated that the misinformation might reach others, he is not liable to them."  Id. (emphasis added).  The rule "requires that the supplier of information receive notice of potential third party claims, thereby allowing it to ascertain the potential scope of its liability and make rational decisions regarding the undertaking."  Id. at 409.  The mere possibility of repetition does not render a party making negligent misrepresentations liable to "anyone to whom it may be repeated."  Id. at 410.  Thus, DCD's claim cannot rest upon alleged representations by Transamerica to Hardwick or DeHaven.  Because there is no evidence of a direct representation by Transamerica to DCD, summary judgment should be granted in Transamerica's favor.

Additionally, the evidence of communications by Transamerica to either third party to DCD is decidedly lacking.  Even if DCD could rely upon Transamerica's alleged promise to Hardwick that it would never increase MDRs, there is no evidence that Hardwick repeated that representation to DCD.  Plaintiffs appear to contend that any representations made by DeHaven to Rosenfeld originated with Transamerica; however, the Court can discern no evidence of communications between Transamerica and DeHaven.  Thus, there does not appear to be evidence that any statement by DeHaven derived from misrepresentations by Transamerica.  Other than the brief portion of the Rosenfeld deposition testimony quoted above, the Court cannot discern any evidence relating to communications between DeHaven, Hardwick, or Transamerica and DCD or Rosenfeld.  At bottom, DCD has not directed the Court to evidence of a misrepresentation originating with Transamerica and actionable by DCD.

In light of the foregoing, the Court **GRANTS** Transamerica's motion for summary judgment regarding DCD's claim for negligent misrepresentation.

---

[17] Both parties direct the Court to Bily and the only other authority relied upon by plaintiffs is a case addressing whether a claim for fraud can be assigned.  Dkt. 320 (citing Osuna v. Albertson, 134 Cal. App. 3d 71, 81, 184 Cal. Rptr. 338 (Ct. App. 1982)).  Because this case does not involve any purported assignment of a claim for fraud, the Court focuses its analysis here on Bily.

**[REDACTED] CIVIL MINUTES – GENERAL**    **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

### E.    UCL

The Court had already held herein that the PIC Plaintiffs lack standing to bring a UCL claim. Thus, the only remaining UCL claim is DCD's. California Business and Professions Code section 17200 prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." Section 17200 allows suits "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." Berryman v. Merit Prop. Mgmt., Inc., 152 Cal. App. 4th 1544, 1554 (2007) (quoting Podolsky v. First Healthcare Corp., 50 Cal. App. 4th 632, 647 (1996)). A breach of contract, standing alone, is insufficient to support a claim brought under the UCL. Shroyer v. New Cingular Wireless Servs., Inc., 622 F.3d 1035, 1044 (9th Cir. 2010).

An "unfair" business practice prohibited by the UCL is one which "offends an established public policy or [] is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." S. Bay Chevrolet v. Gen. Motors Acceptance Corp., 85 Cal. Rptr. 2d 301, 316 (1999). The "determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." Motors, Inc. v. Times Mirror Co., 102 Cal. App. 3d 735, 740 (1980). Plaintiffs argue that their claim for an "unfair" business practice should proceed to trial because Transamerica improperly relied upon "race- and community- based data to 'justify' its increase of the MDR, evidenc[ing] business practices that are immoral, unethical and unfair." Opp'n Memo at 24. The Court has already ruled here that, if Transamerica raised the MDR because of racial animus, that would be an "immoral, unethical, and unfair" business practice giving rise to a UCL claim. See dkt. 39 at 19.

There is no absolute right to summary judgment. A trial court may deny summary judgment where "there is reason to believe that the better course would be to proceed to a full trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Here, the Court finds that DCD's claim for breach of contract presents material issues of disputed fact and that evidence suggesting racial animus may support DCD's claim for breach of contract. Resolution of DCD's UCL claim will require the Court to weigh

**[REDACTED] CIVIL MINUTES – GENERAL**    **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

Transamerica's motives and any impact racial discrimination might have had upon DCD. With the foregoing observations in mind, the Court finds that the better course will be to permit the UCL claim to proceed to trial after which the Court will better able to weigh the evidence and relevant considerations in their entirety. Ultimately, because DCD's UCL claim will be decided by the Court, see Ortega v. Nat. Balance Inc, No. 13-cv-05942-AB, 2014 WL 12560623, at *3 (C.D. Cal. Oct. 29, 2014) (it is the duty of the Court to determine the merits of a UCL claim, not a jury), no benefit will inure from summary adjudication of DCD's UCL claim based upon racial animus.

Although there is *some* evidence from which one might infer that Transamerica targeted these Policies for an MDR increase because of the race of the insureds and any such evidence is *relevant* to the claim for breach of contract claim, this order should not be read to imply that said evidence is compelling. Additionally, it is not clear what impact any discrimination had upon DCD insofar as DCD's investment decision also appears to have been premised upon higher mortality in the African-American community. The importance of these considerations and the appropriate weight to be given to different evidence is better left until after the Court has considered the evidence introduced at trial in this matter. Thus, DCD's claim that Transamerica's MDR increase was an act of racial discrimination withstands the motion for summary judgment.[18]

---

[18] Plaintiffs' briefing does not distinguish between DCD's claim for violation of the UCL and the PIC Plaintiffs' claim for violation of the UCL. Plaintiffs argue that Transamerica engaged in fraud by making misrepresentations to Hardwick, thus violating the "fraudulent" prong of the UCL. However, the party asserting a UCL claim for fraudulent conduct must, itself, have relied upon an alleged misrepresentation. In re iPhone Application Litig., 6 F. Supp. 3d at 1022. A party cannot bring a claim under the fraud prong of the UCL simply because, after investing, it learned of misrepresentations to other parties. See Phillips v. Apple Inc., No. 15-cv-04879-LHK, 2016 WL 1579693, at *7 (N.D. Cal. Apr. 19, 2016) ("If Plaintiffs did not view Apple's statement until after suffering injury, then viewing the statement could not have been the 'immediate cause' of the injury"). Because there is no evidence that Transamerica made misrepresentations to DCD, DCD cannot bring a UCL claim predicated upon purported fraud. As with DCD's negligent misrepresentation claim, DCD will not be permitted to pursue a fraud theory at trial because DCD has not presented evidence that Transamerica made a misrepresentation to DCD.

**[REDACTED] CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

The Court **DENIES** Transamerica's motion for summary judgment regarding DCD's UCL claim.

### F.     Declaratory Relief

Plaintiffs seek declaratory relief regarding the parties' on-going rights under the Policies, including, specifically, whether Transamerica must change rates on a uniform basis across "an entire class of insured," and under what conditions Transamerica may raise the MDR.  SAC ¶ 92.  Declaratory relief may be granted when an "actual" and "present controversy" exists "over a proper subject."  5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 817, p. 273.  The gravamen of Transamerica's argument regarding this claim is that there is no continuing controversy between the parties because the Policies describe the parties' rights and the MDR increase here was authorized by the Policies.

There does not appear to be any ongoing controversy between the PIC Plaintiffs and Transamerica because none of the PIC Plaintiffs' claims withstand summary judgment.  The PIC Plaintiffs have not been denied any benefits under the Policies and have not been affected by the MDR increase.  Even if Transamerica must change rates across a uniform class of insureds, failed to do so here, and breached the Policies by impermissibly raising the MDR, those findings would not resolve a controversy between Transamerica and the PIC Plaintiffs.  Accordingly, the Court **GRANTS** summary judgment to Transamerica regarding the PIC Plaintiffs' claim for declaratory relief.[19]

---

[19] It appears to be undisputed that, at this time, none of the Policies has lapsed because DCD has continued to pay the Policies' minimum-premiums.  At the hearing on this matter, the Court requested oral argument regarding whether the PIC Plaintiffs contend that there is a present controversy regarding the risk of policy lapse and, if so, what declaratory relief the PIC Plaintiffs seek.

In response, plaintiffs' counsel stated only that DCD had not yet decided whether it would continue to pay the Policies' premiums in the future and that said decision may turn upon the resolution of this action.  Thus, the PIC Plaintiffs appear to concede that the risk they face in relation to policy lapse is, at a minimum, contingent upon the outcome of DCD's claims for relief.  If DCD prevails in its claims, there does not appear to be any

**[REDACTED] CIVIL MINUTES – GENERAL**    **'O'**

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|----------|--------------------------|------|----------------|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

Insofar as the Court finds material issues of disputed fact regarding DCD's breach of contract claim, there *is* a continuing controversy between DCD and Transamerica in which declaratory relief may be appropriate. Accordingly, the Court **DENIES** Transamerica's motion insofar as it relates to DCD's declaratory relief claim.

### G. Summary

In summary, what remains of this case for trial is principally a contract dispute between Transamerica and DCD, a company that invested in certain policies issued by Transamerica. The Court **GRANTS** summary judgment to Transamerica regarding all of the PIC Plaintiffs' claims. The Court further **GRANTS** summary judgment regarding DCD's claims for tortious breach of the covenant of good faith and fair dealing as well as negligent misrepresentation. The Court **DENIES** summary judgment regarding DCD's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the UCL, and declaratory relief.

## V. CONCLUSION

Transamerica's motion for summary judgment is **GRANTED in part** and **DENIED in part**.

The motion is **GRANTED** regarding the following claims:

- all of Hardwick's claims;
- all of PIC LLC's claims;

---

risk of policy lapse. If Transamerica prevails, the PIC Plaintiffs do not assert that injury to them is certain. Accordingly, the PIC Plaintiffs' claim for declaratory relief does not withstand the motion for summary judgment. See Ward v. City of Barstow, No. 15-cv-0444-DSF, 2015 WL 4497950, at *6 (C.D. Cal. July 22, 2015) (to have standing to seek declaratory relief, the "continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)).

## [REDACTED] CIVIL MINUTES – GENERAL          'O'

| Case No. | 2:15-cv-03238-CAS (VBKx) | Date | August 9, 2017 |
|---|---|---|---|
| Title | DCD PARTNERS, LLC ET AL. V. TRANSAMERICA LIFE INSURANCE COMPANY ET AL. | | |

- DCD's third claim for tortious breach of the duty of good faith and fair dealing; and
- DCD's sixth claim for negligent misrepresentation.

The motion is **DENIED** with respect to:

- DCD's first claim for breach of contract;
- DCD's second claim for breach of the implied covenant of good faith and fair dealing;
- DCD's fourth claim for violation of the UCL; and
- DCD's fifth claim for declaratory relief.

IT IS SO ORDERED.

| | 00 | 00 |
|---|---|---|
| Initials of Preparer | | CMJ |